IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

HEATHER Q. BOLINGER, *et al.*　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　Plaintiffs,　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　:　　CIVIL ACTION NO.
　　　　　　　　　　　　　　　　　　:　　2:10-CV-211-RWS
FIRST MULTIPLE LISTING　　　　　:
SERVICE, INC., *et al.*　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　Defendants.　　　　　　　　:

## ORDER

This case comes before the Court on Defendants' Joint Motion to

Dismiss the Amended Complaint [54].  After holding a hearing and reviewing

the record, the Court enters the following Order.

### Background

Plaintiffs filed this amended class action complaint seeking relief under

the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607, *et*

*seq.*, the Sherman Act, 15 U.S.C. § 1, *et seq.*, and Georgia law.  (Am. Compl.,

Dkt. No. [47] ¶ 1.)  Named as Defendants are First Multiple Listing Service,

Inc. ("FMLS"); Gainesville-Hall County Board of Realtors, Inc.; Atlanta Board

of Realtors, Inc.;[1] Lanier Partners, LLC, d/b/a Keller Williams Realty Lanier

Partners; Heritage Real Estate, Inc., d/b/a Coldwell Banker Heritage Real

Estate; Peggy Slappey Properties, Inc.; Atlanta Partners Realty, LLC, d/b/a

Keller Williams Realty Atlanta Partners; Bueno and Finnick, Inc., d/b/a Re/Max

Center Dacula;[2] individuals Sue Edwards, Mary Beth Smallen, and Patricia

Garner;[3] and "John Doe Members Comprising Defendant Class of Residential

Real Estate Brokers Similarly Situated as Members of FMLS" ("John Doe

Members").[4]  The named Plaintiffs are Georgia residents who bought or sold

---

[1] The Court refers to the Gainesville-Hall County Board of Realtors, Inc. and Atlanta Board of Realtors, Inc. collectively as the "Boards of Realtors," consistent with the Amended Complaint (Dkt. No. [47] ¶ 7).

[2] Keller Williams Realty Lanier Partners, Coldwell Banker Heritage Real Estate, Peggy Slappey Properties, Inc., Keller Williams Realty Atlanta Partners, and Re/Max Center Dacula are real estate brokerage firms to which Plaintiffs refer collectively as the "Defendant Class Representatives."  (Am. Compl., Dkt. No. [47] ¶¶ 16-22.)

[3] The Court refers to these individuals as the "Defendant Agents," consistent with the Amended Complaint  (Dkt. No. [47] ¶ 16).

[4] Plaintiffs refer to the John Doe Members and the Defendant Class Representatives collectively as the "Defendant Brokers" or "Defendant Class."  (Am. Compl., Dkt. No. [47] ¶ 24.)  Plaintiff defines the "Defendant Brokers" as "Georgia real estate brokerage companies which, through their brokers and agents, assist purchasers and sellers of real estate."  (Id. ¶ 28.)  The Court refers to the Defendant Class Representatives and the John Doe Members collectively as the "Defendant Brokers."

property listed on the FMLS database and who were represented by the

Defendant Brokers and Agents; they represent a putative class of Plaintiffs that

includes all buyers and sellers of real estate listed on the FMLS database who

were represented by the Defendant Brokers and Agents.  (Am. Compl., Dkt. No.

[47] ¶ 25.)

## A.    FMLS, Brokers, and Agents

Defendant FMLS was founded by a group of Atlanta real estate brokers

as a joint venture to "operat[e] . . . a multiple listing service . . . for the benefit

of licensed real estate brokers."  (Id. ¶ 36.)  The purpose of FMLS is to enable

real estate professionals "to widely share information relating to properties they

list for sale, and to research and present property-related information to their

clients seeking to buy or sell real estate."  (Id. ¶ 45.)  To that end, FMLS

provides an electronic database (the "FMLS database") on which properties in

Georgia and in other parts of the southeastern United States can be listed for

sale.  (Id. ¶ 41.)

Only "Members" of FMLS can directly access the FMLS database and

list properties for sale.  (Id. ¶ 28.)  Additionally, under FMLS Rule 6, Members

of FMLS are required to "list on the FMLS database any property for sale that

3

is located in a defined geographic area (the "Compulsory Area")."  (Id. ¶ 70.)

The Defendant Brokers and Agents are the "Members" of FMLS.[5]  (Id.)  As a

result of Rule 6, "consumers who engage any of the Defendant Brokers to sell

property located in the Compulsory Area are required to list the property on the

FMLS database."  (Id. ¶ 267.)

### B.   Fee Structure of FMLS

The fee structure of FMLS involves three principal components.[6]  First,

FMLS charges its Broker Members a $500 application fee.[7]  (Id. ¶ 60.)  Second,

FMLS charges its Broker Members a fee each time a property listed on the

FMLS database is sold.  (Id. ¶ 61.)  Plaintiffs refer to this fee as the "Hidden

---

[5] Plaintiffs further classify the Defendant Brokers and Agents as, respectively, "Principal Members" and "Associate Members."  (Am. Compl., Dkt. No. [47] ¶¶ 42-43.)  Plaintiffs also appear to refer to the Defendant Brokers (or "Principal Members") simply as "Members."  (Id. ¶ 43.)  Where possible, the Court refers to these two groups as "Broker Members" and "Agent Members" to avoid confusion.

[6] At the hearing on Defendants' Motion to Dismiss, the Court heard much testimony from Defendants' counsel and from the President of FMLS, Mr. Cantey Davis, regarding the fee structure of FMLS.  (Hr'g Tr., pp. 4-10.)  Given that this case is before the Court on a motion to dismiss, however, the Court must accept as true the factual allegations in the Amended Complaint regarding the FMLS fee structure.

[7] This is in addition to a refundable security deposit that ranges from $1,500 to $3,000.  (Am. Compl., Dkt. No. [47] ¶ 62.)

Settlement Fee."[8]  (Id.)  The Hidden Settlement Fee is calculated by multiplying

.0012 times the selling price of the property as shown on the Housing and

Urban Development-1 (HUD-1) settlement statement.[9]  (Id. ¶ 82.)  Finally,

FMLS requires its Broker Members to pay a Minimum Annual Fee of $1,500.[10]

(Id. ¶ 63.)  FMLS collects this fee in January of each year, but deducts from it

the amount of Hidden Settlement Fees the Broker Member has paid to FMLS

during the preceding year.  (Id. ¶ 63.)

### i.    *The Hidden Settlement Fees*

Central to the claims in the Amended Complaint is the Hidden Settlement

Fee.  FMLS Rules 14 and 16 facilitate collection of this fee.  (Id. ¶¶ 107-08.)

---

[8] As explained below, Plaintiffs call this fee a "Hidden Settlement Fee" because they allege it is paid out of real estate settlement proceeds (specifically, Broker and Agent commissions) and is not disclosed to the buyers or sellers involved in the underlying transaction.  (Am. Compl., Dkt. No. [47] ¶¶ 61, 102, 106.)  For the sake of clarity, the Court utilizes Plaintiff's terminology and refers to this fee as the "Hidden Settlement Fee."  In doing so, however, the Court does not endorse any pejorative description of the fee.

[9] This is the case if the listing and selling agents are affiliated with the same brokerage firm.  (Am. Compl., Dkt. No. [47] ¶ 82.)  If the listing and selling agents are affiliated with different brokerage firms, however, the Fee is doubled, and is calculated by multiplying .0024 times the selling price of the property.  (Id. ¶ 83.)

[10] In addition to the Minimum Annual Fee, FMLS also charges its Members various fixed fees for, e.g., listing a rental ($7) or removing unsold properties from the FMLS database ($25).  (Am. Compl., Dkt. No. [47] ¶ 64.)

Under Rule 14, a listing Member must notify FMLS whenever a purchase and sale agreement for property listed on the FMLS database is executed, and must do so within three days of the agreement's execution.  (Id. ¶ 107.)  FMLS Rule 16 further requires both listing and selling Members to (1) notify FMLS that the property sale has closed within 72 hours of the closing; (2) submit to FMLS a copy of the first two pages of the HUD-1 settlement statement[11] within 72 hours of the closing; and (3) remit payment of the Hidden Settlement Fee to FMLS within ten days of the date of closing.  (Id. ¶ 108.)  Submission of the HUD-1 enables FMLS to calculate the amount of the Hidden Settlement Fee owed, as the HUD-1 reports the selling price of the property.  (Id. ¶ 122.)  Under FMLS Rule 21, if the Hidden Settlement Fee is not paid in accordance with Rule 16, the amount of the fee is doubled.  (Id. ¶ 110.)

---

[11]  The HUD-1 settlement statement "is a two-page form to be used as a statement of all charges and adjustments paid in connection with a residential real estate settlement and to be given to the parties in connection with the settlement." (Am. Compl., Dkt. No. [47] ¶ 112.)  It serves to "itemize all charges imposed upon the borrower and the seller, including all sales commissions, whether to be paid at settlement or outside of settlement."  (Id. ¶ 113.) Accordingly, "[b]rokers and agents are required to disclose to their principals (i.e., buyers and sellers) on the HUD-1 Settlement Statement the true amount and basis of calculating their compensation." (Id. ¶ 114.)

The Hidden Settlement Fees are paid by the Defendant Brokers to FMLS out of real estate settlement proceeds (i.e., real estate commissions).  (Id. ¶¶ 88, 95, 123, 270.)  The Defendant Brokers pay this Fee to FMLS before splitting the commissions with the Defendant Agents (id. ¶ 88); thus, the Defendant Brokers and Agents both contribute to funding the Hidden Settlement Fee through their commissions (id. ¶ 135).  Plaintiffs allege that "[t]he Defendant Agents who received real estate commissions from the subject settlements acquiesced in splitting those commissions with FMLS by paying the Hidden Settlement Fees in connection with real estate settlements . . . ."  (Id. ¶ 271.) (See also id. ¶ 95 ("The Hidden Settlement Fee represents the split of a real estate commission between FMLS and its [Broker Members] and [Agent Members] . . . ."); id. ¶ 123 ("The Hidden Settlement Fee is funded from the commissions paid by the affected consumers to the listing and selling Members at the closing of the sale of the property.").)

Plaintiffs further allege that the Hidden Settlement Fees establish a "'floor' or minimum commission rate for residential real estate settlements involving FMLS . . . ."  (Id. ¶ 92.)  That is,

7

> [B]y requiring the [Defendant Brokers and Agents] to incur
> additional costs, [the Hidden Settlement Fees] establish a minimum
> floor for commissions and are passed along to such purchasers and
> sellers in the form of higher fees and commissions, or impede or
> prevent some sales that would have occurred but for such
> additional settlement costs, or both.

(Id. ¶ 181.)  Finally, Plaintiffs allege that the Hidden Settlement Fees are not

disclosed to purchasers or sellers, despite the fact that the Fees are paid with

settlement proceeds (i.e., real estate commissions Plaintiffs pay the Defendant

Brokers and Agents).  (Id. ¶¶ 61, 95, 123, 124.)  Specifically, Plaintiffs allege

that Hidden Settlement Fees are not disclosed on the HUD-1 settlement

statement (id. ¶ 124), even though, as stated in footnote 10, *supra*, brokers and

agents are required to disclose to buyers and sellers on the HUD-1 the "true

amount and basis of calculating their compensation"  (id. ¶ 114).

    ii.    *The Kickbacks*

       Plaintiffs also allege that FMLS provides no services in exchange for the

Hidden Settlement Fees (id. ¶¶ 81, 96) and does not use the Hidden Settlement

Fees to pay its own expenses (id. ¶ 95).  On the contrary, Plaintiffs allege that

FMLS uses the collected Hidden Settlement Fees to fund "Kickbacks"[12] to

---

[12] Defendants refer to these payments as "Patronage Dividends."  (Defs.' Joint
Mot. to Dismiss, Dkt. No. [54-8] at 8-9 & 9 n.5.)  As with "Hidden Settlement Fees,"

certain Broker Members in exchange for their referral of listing business: "The sole reason for the creation the [sic] Hidden Settlement Fee structure was to split fees and enable FMLS to provide the Defendant Brokers with kickbacks in exchange for referrals." (Id. ¶ 67.) Additionally, Plaintiffs allege that the Kickbacks "caused [the Defendant Brokers and Agents] to list properties for sale on the FMLS database." (Id. ¶ 158.)

The mechanics of the Kickbacks are alleged to be as follows: FMLS "commingles all or some portion of the Hidden Settlement Fees received from multiple settlements to fund the Kickbacks." (Id. ¶ 137.) Although both Agent Members and Broker Members fund the Hidden Settlement Fees through their commissions, only Broker Members receive Kickbacks. (Id. ¶ 135.) Once a Broker Member has satisfied the Minimum Annual Fee by paying FMLS at least $1,500 in Hidden Settlement Fees for that year, FMLS pays that Broker Member Kickbacks in an amount "at least equal to" the Hidden Settlement Fees that Member has paid. (Id. ¶ 132.) (Members are required to continue paying Hidden Settlement Fees even after the Minimum Annual Fee has been

the Court will utilize Plaintiff's terminology and refer to these payments as "Kickbacks." The Court does so only for the sake of clarity, however, and does not endorse the pejorative description of the payment.

satisfied.)  (Id.)  If a Member does not pay sufficient Hidden Settlement Fees to

satisfy the Minimum Annual Amount, however, that Member will not receive a

Kickback.  (Id. ¶ 134.)

Plaintiffs thus allege that "FMLS pays kickbacks to Defendant Brokers

based on the amount of business Defendant Brokers' agents and brokers refer to

FMLS . . . ."  (Id. ¶ 315.)  (See also id. ¶ 129 ("FMLS pays Kickbacks as

referral fees based on the volume of business provided by the broker Member to

FMLS."); id. ¶ 133 ("As such, the Kickbacks are based not on any services . . .

but rather on the volume or quantity of Hidden Settlement Fees the Member has

paid to FMLS.").)  Furthermore, given that FMLS commingles all or some of

the Hidden Settlement Fees received to fund Kickbacks that are paid to only

certain Broker Members, Broker Members receiving Kickbacks are "sharing

Hidden Settlement Fees on settlements in which the [Broker Member] or their

[Agents] are not the broker or agent of record and are unaffiliated with the

settlement."  (Id. ¶ 138.)  Finally, Plaintiffs allege that "Broker Members [who]

do not receive Kickbacks are impeded from reducing [their] commissions."

(Id. ¶ 140.)

Finally, like their allegations concerning the Hidden Settlement Fees, Plaintiffs allege that the Kickbacks are not disclosed on the HUD-1 settlement statement to buyers and sellers of real estate, despite the fact that they are funded by settlement proceeds.  (Id. ¶ 128.)  Plaintiffs allege that FMLS and the Defendant Brokers "agreed not to disclose the Kickbacks to their clients (purchasers and sellers) or even to their agents."  (Id. ¶ 148.)  Furthermore, Plaintiffs allege that the Kickbacks, like the Hidden Settlement Fees, require the Defendant Brokers and Agents to incur additional costs, which "establish a minimum floor for commissions and are passed along to . . . purchasers and sellers in the form of higher fees and commissions . . . ."  (Id. ¶ 181.)

Based on the facts stated above, Plaintiffs assert various claims against Defendants under federal and state law.  In Counts I and II of the Amended Complaint, Plaintiffs assert claims against FMLS, the Defendant Brokers, and the Defendant Agents under RESPA Sections 8(a), 8(b), and 8(c).  In Count III, Plaintiffs allege that all Defendants have engaged in a price-fixing conspiracy regarding broker commissions in violation of the Sherman Act.  In Counts IV through VIII, Plaintiffs assert claims under Georgia state law for Unfair Competition, violation of the Georgia Uniform Deceptive Trade Practices Act

11

(UDTPA), Unjust Enrichment and Money Had and Received, Negligent

Misrepresentation, and finally, Civil Conspiracy.  The Court considers

Defendants' Motion to Dismiss as to each count.

## Discussion

### I.    Legal Standard for Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief."  While this pleading standard does not require "detailed factual

allegations," "labels and conclusions" or "a formulaic recitation of the elements

of a cause of action will not do."  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007)).  In order to withstand a motion to dismiss, "a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  A

complaint is plausible on its face when the plaintiff pleads factual content

necessary for the court to draw the reasonable inference that the defendant is

liable for the conduct alleged.  Id.

AO 72A
(Rev.8/82)

At the motion to dismiss stage, "all-well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

## II.    RESPA Claims (Defendants FMLS, Brokers, and Agents) (Counts I, II)

In Counts I and II of the Amended Complaint, Plaintiffs assert claims against FMLS, the Defendant Brokers, and the Defendant Agents (collectively, the "RESPA Defendants") under RESPA Sections 8(a), 8(b), and 8(c) (12 U.S.C. §2607(a)-(c)).  RESPA is alleged to apply in this case because all of the transactions at issue involve "federally related mortgage loans" within the meaning of RESPA.  (Am. Compl., Dkt. No. [47] ¶ 151.)  Furthermore, the Defendant Brokers and Agents are alleged to be "real estate settlement services

13

providers" (id. ¶ 262), while FMLS is alleged to provide services or business

"incident to" or "part of" a real estate settlement service (id. ¶¶ 104, 264).[13]

Plaintiffs' Section 8(a) and 8(b) claims are raised in Count I, while the Section

8(c) claim is raised in Count II.  The Court considers each claim in turn.

> A.      RESPA § 8(a) (Count I)

In Count I of the Amended Complaint, Plaintiffs allege that FMLS and

the Defendant Brokers and Agents have violated Section 8(a) of RESPA

through the payment and receipt of Kickbacks.  RESPA Section 8(a) provides,

> No person shall give and no person shall accept any fee, kickback
> or thing of value pursuant to any agreement or understanding, oral
> or otherwise, that business incident to or part of a real estate
> settlement service involving a federally related mortgage loan shall
> be referred to any person.

12 U.S.C. § 2607(a).  Plaintiffs' Section 8(a) theory is as follows:

> The payment and receipt of Kickbacks violated [Section 8(a)] in
> that they were a fee, kickback, or thing of value for referral of
> business incident to real estate settlement services involving
> federally related mortgage loans and were paid pursuant to an
> agreement of understanding that the Hidden Settlement Fees would
> be paid by the Defendant Brokers to FMLS from settlement
> proceeds.

---

[13] In the alternative, Plaintiffs allege that FMLS itself provides real estate
settlement services within the meaning of RESPA.  (Am. Compl., Dkt. No. [47] ¶¶
103, 263.)

(Am. Compl., Dkt. No. [47] ¶ 279.)

As set forth immediately above and in the Background section, *supra*, the allegations underlying this theory are, first, that FMLS provides "business incident to or part of a real estate settlement service"–i.e., access to the FMLS database, which the Defendant Brokers and Agents use in connection with providing real estate settlement services to their clients, Plaintiffs.  (Id. ¶¶ 104, 264.)   Second, Plaintiffs allege that the Defendant Brokers and Agents refer Plaintiffs' listing business to FMLS by paying FMLS Hidden Settlement Fees funded by real estate commissions paid by Plaintiffs.  (Id. ¶¶ 135, 271, 279, 315.)   And finally, Plaintiffs allege that FMLS pays Kickbacks to the Broker Members in exchange for this referral of the Plaintiffs' business.  (Id. ¶¶ 67, 129, 132, 133, 135, 315.)

Defendants contend that Plaintiffs' Section 8(a) claim fails as a matter of law.  (Defs.' Joint Mot. to Dismiss, Dkt. No. [54-8] at 19.)  In support of this contention, Defendants argue, first, that FMLS's services do not constitute "business incident to settlement services" and therefore that FMLS is not subject to RESPA Section 8(a).   (Id. at 30-33.)  Defendants argue that "business incident to settlement services" encompasses only "direct charges to

15

consumers for components of settlement services" and not "a cost of doing business absorbed by the settlement service provider." (Id. at 30-31.)  In other words, Defendants argue that Plaintiffs were not charged for the costs of FMLS's services, which were instead absorbed by the Defendant Brokers and Agents, and thus that FMLS's services are not "incident to" the settlement services the Brokers and Agents provide to Plaintiffs.  (Id. at 31.)

Second, Defendants argue that Plaintiffs were not "referred" to FMLS by the Defendant Brokers, as required to show a violation of Section 8(a), because the Plaintiffs were not charged for FMLS's services.  (Id. at 34.)  In this regard, Defendants contend, "Inherent in the concept of a RESPA referral is that the person being referred is or will be charged a fee for the service provided."  (Id.)  Because Plaintiffs were not charged, the argument goes, Plaintiffs were not "referred" to FMLS.[14]  (Id.)

The Court finds these arguments to be without merit.  As stated above, when considering a 12(b)(6) motion to dismiss for failure to state a claim, the Court is to accept as true the facts alleged in the complaint and construe all

---

[14] In addition to arguing that Plaintiffs in fact were not charged and therefore were not "referred," Defendants argue that Plaintiffs do not even allege that they were charged.  (Id. at 20.)

16

reasonable inferences from those facts in the light most favorable to the plaintiff. The Court is only to dismiss the complaint on 12(b)(6) grounds if the facts alleged, taken as true, fail to make a plausible showing that Plaintiffs are entitled to relief. Defendants' arguments for dismissal thus miss the mark: Defendants do not argue that the facts alleged by Plaintiffs, even if true, do not show a plausible claim for relief; instead, Defendants' arguments attack Plaintiffs' allegations on the merits. Defendants' arguments thus would be proper on a motion for summary judgment but are not proper on a motion to dismiss.

The Court concludes that Plaintiffs have alleged sufficient facts to state a plausible claim for relief against FMLS and the Defendant Brokers under Section 8(a) of RESPA. Plaintiffs have alleged that FMLS provides "business incident to" the provision of a real estate settlement service–i.e., access to the FMLS database. They have alleged that the Defendant Brokers and Agents "referred" Plaintiffs' business to FMLS by paying FMLS Hidden Settlement Fees funded by real estate commissions.[15]  And finally, they have alleged that

_____

[15] Given that the case is before the Court on a motion to dismiss, it is sufficient that Plaintiffs have alleged they were "referred" to FMLS. Contrary to Defendants' argument (see fn. 15, supra), Plaintiffs need not have alleged they were "charged" for

FMLS paid the Defendant Brokers Kickbacks.  If all of these facts are true,

Plaintiff is entitled to relief under RESPA Section 8(a) as against FMLS and the

Defendant Brokers.

With respect to the Defendant Agents, however, the Court finds that

Plaintiffs have failed to show a plausible claim for relief given their allegation

that FMLS paid Kickbacks *only* to the Defendant Brokers and not to the

Defendant Agents.  (See, e.g., Am. Compl., Dkt. No. [47] ¶ 135 ("Although

Members (brokers) and Associate Members (agents) both contribute to funding

a Hidden Settlement Fee through commissions, only the broker Members

receive Kickbacks.") .)  Plaintiffs do not allege in the alternative that the

Defendant Agents are paid Kickbacks, nor do they allege that the Defendant

---

FMLS's services to allege a "referral" and withstand Defendants' motion to dismiss.
Whether Plaintiffs were "charged" is an issue going to the *merits* of whether they were
"referred."  On a motion to dismiss, however, the Court accepts as true the facts
alleged in the complaint and determines whether those facts show a plausible claim for
relief.  In this case, if, as Plaintiff's allege, Plaintiffs' business was "referred" by the
Defendant Brokers to FMLS in exchange for Kickbacks, Plaintiffs are entitled to
relief.  The Court notes, however, that even if Plaintiffs were required to allege that
they had been "charged," it appears to the Court that they have done so.  (See, e.g.,
Am. Compl., Dkt. No. [47] ¶ 181 ("The Hidden Settlement Fees and the Kickbacks
harm purchasers and sellers of real estate by requiring the Members and their
Associate Members to incur additional costs, which additional costs establish a
minimum floor for commissions and *are passed along to such purchasers and sellers
in the form of higher fees and commissions . . . ."*) (emphasis added).)

18

Agents themselves pay a Kickback to any person.  Under the plain language of

Section 8(a), the Defendant Agents can only be found to have violated that

provision if they have "give[n]" or "accept[ed]" a "fee, kickback, or thing of

value" in exchange for the referral of business.  Given Plaintiffs' failure to

allege that the Defendant Agents have given or received a Kickback, they have

failed to state a plausible claim for relief against the Defendant Agents under

RESPA Section 8(a).

Accordingly, Defendants' Motion to Dismiss is granted as to Plaintiffs'

Section 8(a) claim against the Defendant Agents.  Defendants' Motion is

denied, however, as to Plaintiff's Section 8(a) claim against FMLS and the

Defendant Brokers.

B.    RESPA § 8(b) (Count I)

Also in Count I of the Amended Complaint, Plaintiffs allege that FMLS

and the Defendant Brokers and Agents have violated Section 8(b) of RESPA

through the improper splitting of broker commissions.  Section 8(b) provides,

> No person shall give and no person shall accept any portion, split,
> or percentage of any charge made or received for the rendering of a
> real estate settlement service in connection with a transaction
> involving a federally related mortgage loan other than for services
> actually performed.

12 U.S.C. § 2607(b).  Plaintiffs allege two different theories as to how the

RESPA Defendants violated this provision.  The first theory concerns the

payment of Hidden Settlement Fees by the Defendant Brokers and Agents to

FMLS (the "Hidden Settlement Fee theory"), and the second concerns the

payment of Kickbacks by FMLS to certain Defendant Brokers (the "Kickback

theory").  The Court considers each theory in turn.

1.    The "Hidden Settlement Fee Theory"

With regard to Plaintiffs' first Section 8(b) theory, the "Hidden

Settlement Fee theory," Plaintiffs argue as follows:

> By paying unearned Hidden Settlement Fees, the Defendant
> Brokers and their brokers and agents shared a portion, split, or
> percentage of real estate commissions received from a real estate
> settlement with a third party, FMLS, that performed no real estate
> settlement services for either purchasers or sellers in exchange for
> such payments, in a manner proscribed by [Section 8(b)].

(Am. Compl., Dkt. No. [47] § 274.)  (See also id. ¶ 273 ("Payment and receipt

of the Hidden Settlement Fees violated [Section 8(b)] in that it represents a split

of commissions paid without rendering any settlement services . . . .").)  As set

forth in the Background section, *supra*, the allegations in the Amended

Complaint underlying this theory are as follows:  First, the Defendant Brokers

and Agents are "real estate settlement services providers."  (Id. ¶ 262.)  Second,

the Defendant Brokers pay FMLS Hidden Settlement Fees out of real estate

commissions paid by Plaintiffs.  (Id. ¶¶ 88, 95, 123, 270.)  Third, because the

Defendant Brokers pay the Hidden Settlement Fees to FMLS before splitting

commissions with the Defendant Agents, the Defendant Agents also fund the

Hidden Settlement Fee through their commissions (and acquiesce in doing so).

(Id. ¶¶ 88, 135, 271.)  Finally, FMLS provides no services in exchange for the

Hidden Settlement Fees.  (Id. ¶¶ 81, 95, 96.)

Defendants argue that this Section 8(b) claim fails as a matter of law first

because FMLS provides a service to the Defendant Brokers and Agents.  (Defs.'

Joint Mot. to Dismiss, Dkt. No. [54-8] at 36.)  Defendants argue,

> Here, the Amended Complaint asserts that the Brokers and Agents
> actually received the services for which they paid Fees to
> FMLS–i.e., access to the FMLS database.  At most, Plaintiffs can
> claim that the services FMLS provided were not sufficient to
> justify the size of the Fee, but any such claim is not cognizable
> under RESPA Section 8(b).

(Id. at 37.)  In their Reply brief in support of their Motion to Dismiss,

Defendants advance the additional argument that Plaintiffs' have failed to plead

facts plausibly showing that Defendants "split" their commissions with FMLS.

21

(Dkt. No. [66] at 5-7.)  Defendants argue that Plaintiffs merely put forward

"conclusory assertions that Defendants 'split' commissions."  (Id. at 5.)

Again, however, Plaintiffs need not prove the merits of their Section 8(b)

claim to withstand a motion to dismiss; instead, they need only allege facts that,

taken as true, show a plausible claim for relief.  The Court finds that Plaintiffs

have carried this burden and that their Section 8(b) claim (under the "Hidden

Settlement Fee theory") does not fail as a matter of law.  First, Plaintiffs plainly

have alleged that the Defendant Brokers and Agents "split" their real estate

commissions with FMLS.  (See, e.g., Am. Compl., Dkt. No. [47] ¶ 95 ("The

Hidden Settlement Fee represents the split of a real estate commission between

FMLS and its Members and Associate Members [i.e., Broker Members and

Agents Members].").)  This is a factual allegation that must be taken as true on

a motion to dismiss; Plaintiff need not allege additional facts to prove that a

"split" actually occurred.  Second, Plaintiffs allege that FMLS did not provide

any service in exchange for this split of commissions.  This is all Plaintiffs are

required to do to state a plausible claim under RESPA Section 8(b).

2.      The "Kickback Theory"

Plaintiffs second Section 8(b) theory, the "Kickback theory," is that the payment of Kickbacks to the Defendant Brokers constituted an impermissible fee split for no services rendered:

> By paying unearned Kickbacks, FMLS shared a portion, split, or percentage of compensation received from a real estate settlement with third parties–the Defendant Brokers–that performed no real estate settlement services, in a manner proscribed by [Section 8(b)].

(Id. ¶ 280.)  (See also id. ¶ 278 ("The Defendant Brokers shared in Kickbacks for which they performed no settlement services.").)  In support of this theory, Plaintiffs first allege that FMLS paid Kickbacks to the Defendant Brokers using settlement proceeds (i.e., in the language of Section 8(b), "compensation received from a real estate settlement")–namely, real estate commissions that the Defendant Brokers and Agents split with and paid to FMLS in the form of Hidden Settlement Fees.  (Id. ¶¶ 67, 123, 137, 276.)  Second, Plaintiffs allege that the Defendant Brokers who received the Kickbacks had performed no services in exchange for the payments.  (Id. ¶¶ 138, 278.)  The Court finds these facts sufficient to show a plausible claim for relief under Section 8(b) against FMLS and the Defendant Brokers.

23

In their Supplemental Memorandum in Opposition to Defendants' Joint Motion to Dismiss, the Plaintiffs explain that the "Kickback theory" of the alleged Section 8(b) violation also encompasses the Defendant Agents. Plaintiffs explain, "As Plaintiffs allege, brokers *and agents* who directly pay HSFs [Hidden Settlement Fees] to FMLS are effectively splitting their commissions with those who receive Kickbacks–after the HSFs are first passed through FMLS–but not for any services rendered by the brokers receiving the Kickbacks."  (Dkt. No. [76] at 9 (emphasis added).)  The Court finds sufficient factual allegations in the Amended Complaint to state a claim against the Defendant Agents under Section (b) using Plaintiff's "Kickback Theory."  As stated above, Plaintiffs have alleged that in addition to the Defendant Brokers, the Defendant Agents split their commissions with FMLS in the form of Hidden Settlement Fees.  Plaintiffs then allege that FMLS uses these funds to pay Kickbacks to the Defendant Brokers, who have allegedly performed no services in exchange for the Kickbacks.  Thus, there are sufficient factual allegations to support a claim that the Defendant Agents split their commissions with Defendant Brokers, not for services rendered, after funneling the split through FMLS.

24

Accordingly, Defendants' Motion to Dismiss is denied as to Plaintiffs'

Section 8(b) claim against all three RESPA Defendants.

C.   RESPA § 8(c)(4) (Count II)

In Count II of the Amended Complaint, Plaintiffs allege that FMLS and

the Defendant Brokers and Agents violated RESPA by operating an undisclosed

"affiliated business arrangement" (ABA) in violation of RESPA Section

8(c)(4).  (Dkt. No. [47] ¶¶ 316, 323-324.)  Section 8(c)(4) provides,

> Nothing in this section shall be construed as prohibiting . . . . (4)
> affiliated business arrangements so long as (A) a disclosure is
> made of the existence of such arrangement to the person being
> referred and, in connection with such referral, such person is
> provided a written estimate of the charge or range of charges
> generally made by the provider to which the person is referred . . .,
> (B) such person is not required to use any particular provider of
> settlement services, and (C) the only thing of value that is received
> from the arrangement, other than the payments permitted under
> this subsection, is a return on the ownership interest or franchise
> relationship . . . .

12 U.S.C. § 2607(c).

Defendants advance two arguments in support of their motion to dismiss

Plaintiffs' Section 8(c)(4) claim.  First, Defendants argue that Plaintiffs have

failed to allege sufficient facts to show that FMLS and the Defendant Brokers

and Agents constitute an "affiliated business arrangement."  (Defs.' Mot. to

25

Dismiss, Dkt. No. [54-8] at 40-41; Defs.' Reply in Supp. Mot. to Dismiss, Dkt.

No. [66] at 17-18.)  Second, Defendants contend that even if Plaintiffs have

properly alleged the existence of an ABA, RESPA Section 8(c) does not

provide an independent cause of action for non-disclosure of ABAs.  (Defs.'

Mot. to Dismiss, Dkt. No. [54-8] at 41-42.)  Instead, Defendants argue, Section

8(c) merely provides a safe harbor from RESPA liability for ABAs that satisfy

certain conditions.  (Id.)

Thus, as a threshold matter, the Court must determine whether Section

8(c) provides an independent cause of action under RESPA.  Only if the Court

finds that it does must the Court decide whether Plaintiffs have alleged

sufficient facts to make a plausible showing of the existence of an ABA that, in

turn, does not satisfy Section 8(c)'s criteria.

1.    *Liability under Section 8(c)(4)*

As stated above, Defendants contend that Section 8(c)(4) does not

provide an independent cause of action under RESPA because it does not

affirmatively require disclosure of ABAs; on the contrary, Defendants contend

that Section 8(c)(4) merely provides a safe harbor from RESPA liability for

ABAs that satisfy certain criteria.  (Defs.' Mot. to Dismiss, Dkt. No. [54-8] at

41-42.)  In support of their argument to the contrary, Plaintiffs cite Pettrey v.

Enterprise Title Agency, Inc., 241 F.R.D. 268, 275 (N.D. Ohio 2006).  In

Pettrey, the court found that ABAs that fail to satisfy the criteria of Section

8(c)(4) do, indeed, violate Section 8 of RESPA.  Id. at 275.  The court reasoned

as follows:

> Sections 8(a) and 8(b) prohibit certain conduct, while Section 8(c)
> provides for safe harbors.  The safe harbor of Section 8(c)(4),
> which provides for ABAs, is necessary precisely because ABAs
> are by their nature likely to fall under the sweeping language of
> Sections 8(a) and 8(b).  Even allowable ABAs are arrangements
> whereby business is referred to a provider of settlement services
> and the referring party receives income from the provider.  It
> follows that a purported ABA that fails to meet the statutory
> requirements for an ABA violates Section 8.  This conclusion is
> supported by subsection 8(d)(3), which provides that 'no person or
> persons shall be liable for a violation of the provisions of
> subsection (c)(4)(A) regarding the disclosure of the ABA
> relationship if certain requirements are met.  12 U.S.C. §
> 2607(d)(3).  The converse is that the statutory ABA requirements
> can be 'violated' such that a person is 'liable.'  HUD regulations
> are to the same effect.  They explain that 'an affiliated business
> arrangement is not a violation of Section 8 of RESPA' only if the
> ABA requirements are met.  24 C.F.R. § 3500.15(b).

The Court agrees with Plaintiffs and finds that Section 8(c)(4) provides

an independent basis for liability under RESPA.  As the Pettrey court noted,

RESPA Section 8(d)(3) supports this conclusion, as this provision immunizes

certain "violations" of Section 8(c)(4) from "liability," thus suggesting that other "violations" do lead to "liability" under RESPA.  Section 8(d)(3) specifically states, "No person or persons shall be liable for a violation of the provisions of subsection (c)(4)(A) of this section if such person or persons proves by a preponderance of the evidence that such violation was not intentional and resulted from a bona fide error . . . ."  12 U.S.C. § 2607(d)(3).  The converse of this provision seems to be that where a violation of § 8(c)(4) is intentional or not resulting from error, it will lead to liability under RESPA.

The HUD regulations also reinforce the Court's conclusion that an ABA's failure to comply with the requirements of Section 8(c)(4) is actionable under RESPA.  According to the regulations promulgated under RESPA, "[a]n affiliated business arrangement is not a violation of section 8 of RESPA . . . *if the conditions set forth in this section are satisfied*."  24 C.F.R. § 3500.15 (emphasis added).  Again, the converse of this provision is that an ABA that does not satisfy the criteria of Section 8(c)(4) is a violation of RESPA.

Other courts have reached the same conclusion and found that Section 8(c)(4) provides an independent cause of action under RESPA.  For example, in Minter v. Wells Fargo Bank, the court considered a class action complaint

alleging separate violations of RESPA Sections 8(a) and 8(c)(4) and–after

undertaking a thorough analysis of RESPA's legislative history and

implementing regulations–rejected the defendants' argument that Section

8(c)(4) does not provide an independent cause of action.  274 F.R.D. 525, 539,

545 (D. Md. 2011).  The court explained the confusion behind Section 8(c)(4)

as follows:

> [T]he nature of an ABA is such that it inherently involves the type
> of transactions RESPA sought to proscribe, and this caused
> confusion.  Despite this apparent inconsistency, Section 8(c)(4)
> unambiguously exempts ABAs from Sections 8(a) and (b) if the
> ABAs satisfy three requirements.  Without further guidance after
> the 1983 amendment [adding the ABA exemption], the question
> then became: if an ABA–which by its very nature may involve
> market-distorting business arrangements–does not satisfy the three
> conditions of Section 8(c)(4), is the ABA a *per se* violation of
> RESPA?  Or, similarly, does the existence of an ABA raise the
> presumption of a Section 8(a) violation, such that Section 8(c)(4)
> merely provides a 'safe harbor' for otherwise suspect
> arrangements?

Id. at 537.  Relying heavily on RESPA § 8(d)(3) and the HUD regulations, like

the Pettrey court, the Minter court answered these questions in the affirmative

and concluded that the failure of an ABA to comply with the conditions of

Section 8(c)(4) constitutes a violation of RESPA.  Id. at 545.  See also

Robinson v. Fountainhead Title Group Corp., 252 F.R.D. 275, 287 ("[T]he

AO 72A
(Rev.8/82)

Court concludes that an ABA must comply with the enumerated conditions of the section 8(c)(4) exception . . . in order to avoid a RESPA violation.").

Defendants rely on McCullough v. Howard Hanna Co., No. 1:09CV2858, 2010 WL 1258112, at *3 (N.D. Ohio Mar. 26, 2010) in support of their argument that an ABA's failure to comply with the conditions of Section 8(c)(4) does not constitute an independent violation of RESPA.  The McCullough court indeed held that an ABA's failure to comply with the conditions of Section 8(c)(4) is not a per se violation of RESPA.  Id.  Thus the court dismissed the plaintiff's Section 8(c)(4) claim after finding the plaintiff had failed to state a claim under Section 8(a).  Id.  In reaching this conclusion, however, the McCullough court relied on a HUD "Proposed Rule," which stated, "[T]here is little legal or factual justification for viewing a[n] [ABA] which fails to meet all elements of the new [ABA] exemption as a per se Section 8 violation."  Id. at *5.  Because this Proposed Rule was never adopted or codified, however, it is of no legal force, and the Court declines to follow a court decision that is largely predicated on it.  See also Minter, 274 F.R.D. at 539, 540 n.19 (declining to follow McCullough, and rejecting defendants' argument based on McCullough, given the McCullough court's reliance on

30

same HUD Proposed Rule).  Accordingly, <u>McCullough</u> does not change the

Court's conclusion that RESPA Section 8(c)(4) provides a cause of action

independent of Sections 8(a) and (b).

    2.    *Stating a Claim under RESPA § 8(c)(4)*

Having found that Section 8(c)(4) does provide an independent cause of

action, the Court must next determine whether Plaintiffs have alleged sufficient

facts to state a plausible claim under this provision.  Accordingly, the Court

must first determine whether Plaintiffs have alleged sufficient facts to plausibly

show that an ABA exists between FMLS and the Defendant Brokers and

Agents.  RESPA defines an ABA as follows:

> [T]he term "affiliated business arrangement" means an
> arrangement in which (A) a person who is in a position to refer
> business incident to or part of a real estate settlement service
> involving a federally related mortgage loan, or an associate of such
> person, has either an *affiliate relationship* with or a direct or
> beneficial ownership interest of more than 1 percent in a provider
> of settlement services; and (B) either of such persons directly or
> indirectly refers such business to that provider or affirmatively
> influences the selection of that provider[.]

12 U.S.C. § 2602(7) (emphasis added).  The regulations promulgated under this

Code section by the Department of Housing and Urban Development (HUD)

define "affiliate relationship" as "the relationship among business entities where one entity has effective control over the other . . . ." 24 C.F.R. § 3500.15(c)(2).

Under the statutory definition of an ABA, an ABA exists where "a person who is in a position to refer business incident to or a part of real estate settlement service" or "an associate of such person" has an "affiliate relationship with" a "provider of settlement services," and either of those persons "directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider." 12 U.S.C. § 2602(7). In the Amended Complaint, Plaintiffs have alleged that "FMLS provides real estate settlement services within the meaning of 12 U.S.C. § 2607." (Dkt. No. [47] ¶ 103.) Plaintiffs also allege that the Defendant Brokers refer Plaintiff's listing business–which business is "incident to" a real estate settlement service–to FMLS. (Id. ¶ 67, 104.) Finally, Plaintiffs allege that the Defendant Brokers and FMLS are affiliated entities because "FMLS is owned by 24 of the Defendant Brokers who are the Stockholder Members." (Id. ¶ 306.) The Court finds these allegation sufficient to make a plausible showing that FMLS and Defendant Brokers and their Agents constitute an "affiliated business arrangement" (ABA) within the meaning of RESPA Section 8(c)(4).

The Court further finds that Plaintiffs have alleged sufficient facts to plausibly show that this ABA does not satisfy the criteria of Section 8(c)(4) and thereby violates RESPA.  As stated above, an ABA does not violate RESPA only if (1) disclosure of the existence of the ABA is made to the person being referred; (2) that person is not required to use the particular provider of settlement services; and (3) the only thing of value received from the ABA is a return on an ownership interest or franchise relationship.  12 U.S.C. § 2607(c)(4)(A)-(C).  In the Amended Complaint, Plaintiffs allege that neither FMLS nor the Defendant Brokes or Agents disclosed to Plaintiffs the existence of their affiliate relationship.  (Dkt. No. [47] ¶¶ 316-317.)  Plaintiffs also allege that they were not given an opportunity to opt-out of using FMLS's services.  (Id. ¶¶ 307-309.)  Finally, Plaintiffs allege that the Defendant Brokers received Kickbacks from FMLS as a result of their affiliate relationship.  (Id. ¶¶ 314-315.)  The Court finds these allegations sufficient to plausibly show that the RESPA Defendants' ABA does not satisfy the conditions of Section 8(c)(4) and therefore violates RESPA.  Accordingly, the Court denies Defendants' Motion to Dismiss as to this Count of the Amended Complaint.

33

**III.    Sherman Act Claim** (All Defendants) (Count III)

In Count III of the Amended Complaint, Plaintiffs allege that the

Defendants have engaged in price-fixing in violation of Section 1 of the

Sherman Act, which prohibits "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the

several States, or with foreign nations . . . ."  15 U.S.C. § 1.  To state a claim

under Section 1 of the Sherman Act, a plaintiff must plead sufficient facts to

plausibly show that Defendants (1) engaged in concerted action that (2)

unreasonably restrained competition.  Jacobs v. Tempur-Pedic Int'l, Inc., 626

F.3d 1327, 1332-33 (11th Cir. 2010).  Thus, the threshold requirement of any

Section 1claim is an "agreement" in restraint of competition or trade.  See, e.g.,

City of Tuscaloose v. Harcros Chemicals, Inc., 158 F.3d 548, 569 (11th Cir.

1998) ("It is settled law that a threshold requirement of every antitrust

conspiracy claim, whether brought under section 1 or section 2 of the Sherman

Act, is an agreement to restrain trade.") (internal quotations and citation

omitted).  As the Supreme Court explained in Twombly, stating a claim under

Section 1 "requires a complaint with enough factual matter (taken as true) to

suggest that an agreement was made."  550 U.S. at 556.  See also Jacobs, 626

AO 72A
(Rev.8/82)

F.3d at 1332-33 ("Plausibility is the key, as the well-pled allegations must nudge the claim across the line from conceivable to plausible.") (internal quotations and citation omitted).

Plaintiffs allege that Defendants violated Section 1 of the Sherman Act by agreeing or conspiring to fix broker commissions.  (Am. Compl., Dkt. No. [47] ¶¶ 335-345.)  Defendants advance several arguments in support of their motion to dismiss this claim, the primary one being that Plaintiffs have failed to allege sufficient facts to plausibly show that Defendants entered into any agreement:

> Yet [Plaintiffs] do not allege any particular agreement on the level of broker commissions.  Plaintiffs do not allege that any employees or officers of any Member-broker got together and reached an agreement on broker commissions, much less that FMLS or any members of the Boards did so.  In fact, they do not allege any communications among the Member-brokers at all.  Instead, Plaintiffs rely solely on the fact of membership in FMLS . . . and the Member-brokers' use of the shared MLS service.

(Defs.' Joint Mot. to Dismiss, Dkt. No. [54-8] at 42.)  The Court thus examines the Amended Complaint to determine whether Plaintiffs have alleged sufficient facts to make a plausible showing that Defendants entered into any agreement to restrain competition by fixing broker commissions.

A.     Contract, Combination, or Conspiracy: Legal Standard

To prove that an agreement in restraint of trade exists between multiple defendants, a plaintiff must "demonstrate a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." City of Tuscaloosa, 158 F.3d at 569.  At the motion to dismiss stage, a plaintiff must allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  Twombly, 550 U.S. at 556.  "A plaintiff cannot state an antitrust claim by merely showing parallel conduct and from it divine that an agreement must be the source from which the parallel conduct arose.  A plaintiff likewise cannot state an antitrust claim by showing only that the Defendants made price information publicly available and thus had the opportunity to conspire. . . ."  In re Delta/AirTran Baggage Fee Antitrust Litig., 733 F. Supp. 2d 1348, 1359 (N.D. Ga. 2010).  As the Court explained in Twombly,

> [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. . . .  A statement of parallel conduct, even conduct consciously undertaken, needs something suggesting the agreement necessary to make out a § 1 claim; *without that further*

AO 72A
(Rev.8/82)

> *circumstance pointing toward a meeting of the minds, an account*
> *of a defendant's commercial efforts stays in neutral territory.*

550 U.S. at 556-57 (emphasis added).  At the same time, however, a plaintiff need not ultimately show an express agreement to prove the existence of an antitrust conspiracy; in fact, most conspiracies ultimately are proven by inference from the conduct of the alleged conspirators.  <u>Seagood Trading Corp. v. Jerrico, Inc.</u>, 924 F.2d 1555, 1573 (11 Cir. 1991).  Thus at the motion to dismiss stage, "Plaintiffs need not allege the existence of collusive communications in 'smoke-filled rooms' in order to state a § 1 Sherman Act claim."  <u>In re Delta/AirTran Baggage Fee Litig.</u>, 733 F. Supp. 2d at 1360.

Applying these criteria, the Court is mindful of the fact that at the motion to dismiss stage, all factual allegations in Plaintiffs' Amended Complaint must be taken as true and all reasonable factual inferences therefrom construed in Plaintiffs' favor.  <u>Hunnings v. Texaco, Inc.</u>, 29 F.3d 1480, 1484 (11th Cir. 1994).  "However, the court need not accept inferences drawn by [Plaintiffs] if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations."  <u>In re Delta/AirTran Baggage Fee Antitrust Litig.</u>, 733 F. Supp. 2d at 1358.  Thus, the

Court need not accept "naked assertions of conspiracy," or even terms like "conspiracy" or "agreement," as factual allegations capable of stating a Section 1 claim.  <u>Twombly</u>, 550 U.S. at 557 (citing <u>FM Research, Inc. v. College of Am. Pathologists</u>, 170 F.3d 53, 56 (1st Cir. 1999)).

B. <u>Contract, Combination, or Conspiracy: Analysis</u>

Plaintiffs argue that an agreement to fix broker commissions plausibly can be inferred from their allegations concerning (1) Defendants' agreement to abide by the FMLS rules and (2) FMLS's collection and dissemination of commission information.  (Pls.' Resp. to Defs.' Mot. to Dismiss, Dkt. No. [60-1] at 11-15, 20-21.)  The Court applies the aforementioned principles to each of these alleged bases of agreement.

*1. Defendants' Agreement to Abide by the FMLS Rules*

First, Plaintiffs contend that a price-fixing agreement regarding broker commissions plausibly may be inferred from Defendants' agreement to adopt and apply FMLS's rules governing the Hidden Settlement Fees and Kickbacks. (<u>Id.</u> at 12.)  As they explain in their Response in opposition to Defendants' Motion to Dismiss,

38

Plaintiffs allege that the Hidden Settlement Fees and Kickbacks 'establish a minimum floor for commissions' and have 'fixed, raised, maintained, and stabilized the commissions . . . by at least the amount of the Hidden Settlement Fees, and . . . thereby caused Plaintiffs to pay higher commissions than they would have paid absent Defendants' illegal contract, combination, or conspiracy.

(Dkt. No. [60-1] at 14-15.)  In support of this theory of a Section 1

"agreement," Plaintiffs assert the following allegations in the Amended

Complaint:

- The Hidden Settlement Fees and the Kickbacks harm purchasers and sellers of real estate by requiring the [Broker Members] and their [Agent Members] to incur additional costs, which additional costs establish a minimum floor for commissions and are passed along to such purchasers and sellers in the form of higher fees and commissions . . . . (Dkt. No. [47] at ¶ 181.)

- . . . Defendants have engaged in a contract, combination, or conspiracy to restrain trade . . . .  In particular, through the

adoption and enforcement of Rules 6,[16] 7,[17] 14,[18] and 16,[19] the Hidden Settlement Fees, and the Kickbacks, the Defendants (a) agreed to and did fix, raise, maintain, and stabilize commissions paid from settlements by purchasers and sellers of real estate listed on the FMLS database by at least the amount of the Hidden Settlement Fee, and (b) thereby caused the Plaintiffs to pay higher commissions . . . . (Id. ¶ 340.)

- FMLS changed its method of calculating the Hidden Settlement Fee to fix its fee and preserve its share of revenue if commissions on a particular transaction fell below 6%.[20] (Id. ¶ 84.)

Defendants, on the other hand, argue as follows:

---

[16] As stated in the Background section, supra, FMLS Rule 6 requires Members of FMLS to list on the FMLS database any property for sale located in the Compulsory Area. (Am. Compl., Dkt. No. [47] ¶ 70.)

[17] FMLS Rule 7 sets forth the procedure and deadlines for listing property on the FMLS database. (Am. Compl., Dkt. No. [47] ¶ 77.)

[18] As set forth in the Background section, supra, FMLS Rule 14 requires listing Members to notify FMLS within three days of the execution of any purchase and sale agreement for property listed on the FMLS database. (Am. Compl., Dkt. No. [47] ¶ 107.)

[19] Also as stated in the Background section, supra, FMLS Rule 16 requires listing and selling Members to notify FMLS of any property closing, submit a copy of the HUD-1 settlement statement to FMLS, and pay FMLS the Hidden Settlement Fee. (Am. Compl., Dkt. No. [47] ¶ 108.)

[20] FMLS allegedly changed the method of calculating the Hidden Settlement Fee owed from 4% of the total commission to .0012 or .0024 times the sale price of the property. (Am. Compl., Dkt. No. [47] ¶ 80, 82-83.)

> Instead of pleading any facts about some alleged agreement among brokers to set commission rates, Plaintiffs allege a stabilization of commissions resulting from each Member-broker's agreement to participate in FMLS and pay its fees. . . .  Because the Member-brokers' agreement to the Rules is the ***only*** concerted action alleged, the Court need not look further to conclude that Plaintiffs do not state a price-fixing claim based on broker commissions. Plaintiff's admitted failure to allege any agreement ***among Member-brokers*** to fix the amount or rate of commissions seals the fate of their antitrust claim: it must be dismissed.

(Defs.' Reply in Supp. Mot. to Dismiss, Dkt. No. [66] at 18 (emphasis in original).)

In support of this theory of concerted action, Plaintiffs argue, "[I]t is well-settled that '[t]he concerted action necessary to establish a Section 1 violation exists in the agreement of [a MLS'] [sic] members to adopt and apply [their] rules and membership criteria.'"  (Pls.' Resp. to Defs.' Mot. to Dismiss, Dkt. No. [60-1] at 12 (citing <u>United States v. Realty Multi-List, Inc.</u>, 629 F.2d 1351, 1361 n.20 (5th Cir. 1980).[21])  In <u>Realty-Multi List</u>, the Eleventh Circuit indeed found concerted action in the agreement of an MLS's members with the MLS's rules: "The concerted action necessary to establish a Section 1 violation

---

[21] In <u>Bonnard v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit decide before October 1, 1981.

41

exists in the agreement of RML's members to adopt and apply [its] rules and membership criteria."  629 F.2d 1361 n.20.  This case is distinguishable, however, from the case at bar.

In <u>Realty-Multi List</u>, the Eleventh Circuit considered an antitrust challenge to the membership rules of RML (a multiple listing service), which required that prospective members, before being eligible for membership, (1) be found by RML to have a "favorable credit report and business reputation," (2) maintain an "active real estate office" that is "open during customary business hours," and (3) buy a share of RML's stock. <u>Id.</u> at 1360.  Licensed real estate brokers who did not satisfy these criteria were ineligible for membership and thus denied access to RML's pool of listings and other services. <u>Id.</u> at 1361. Furthermore, the RML rules required members to deny non-members (i.e., licensed real estate brokers who did not satisfy the aforementioned criteria) access to the listing pool and other RML services. <u>Id.</u>  The United States Government challenged these rules as giving RML the power to order a group boycott of non-members in violation of Section 1 of the Sherman Act. <u>Id.</u> at 1360.

42

The Eleventh Circuit found that by agreeing to the aforementioned rules, the members of RML acted in concert to deny non-members access to RML's services. Id. at 1361, 1361 n.20.  Specifically, the Eleventh Circuit determined that the RML members had engaged in a group boycott that properly could be challenged under Section 1:

> A concerted denial of access to RML's listing service, when RML's members have agreed to pool and share their listings, amounts to a group boycott of the nonmember. . . .  In Silver v. New York Stock Exchange, 373 U.S. 341, 83 S. Ct. 1246, 10 L.E.2d 389 (1963), the Supreme Court, in finding a Section 1 violation when the stock exchange ordered members to remove private wire connections with a nonmember broker, stated:
>
>> The concerted action of the Exchange and its members here was, in simple terms, a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market. Id. at 1252.
>
> We must therefore determine whether this group boycott offends Section 1 of the Sherman Act.

Realty Multi-List, Inc., 629 F.2d at 1361.  Thus, in some circumstances, Plaintiffs are correct that the concerted action necessary to state a Section 1 claim may exist in the agreement of an MLS's members to abide by the MLS's rules.

43

Realty Multi-List is understandably appealing to Plaintiffs in this case, as in that case, the court found concerted action among an MLS's members despite the absence of any evidence of member-to-member communications or agreement.  Instead, the court found concerted action by virtue of each member's independent agreement to the MLS's rules.  However, the rules being challenged in Realty Multi-List in fact required concerted action: the rules required each member to boycott non-members, and thus, in effect, required a group boycott.  Thus, the rules directly required the conduct that was challenged as concerted action in restraint of trade.

In this case, however, the FMLS rules being challenged do not directly require concerted action that restrains competition (unlike in Realty Multi-List). Indeed, Plaintiffs do not make this argument.  Instead, Plaintiffs ask the Court to infer from the FMLS rules–rules that require the Defendant Brokers and Agents to pay a fee for FMLS's services–that all Defendants have agreed or conspired to fix broker commissions.  This inference, however, is not supported by fact or logic and is one that the Court–despite its searching analysis of the Amended Complaint–cannot draw.

AO 72A
(Rev.8/82)

The Court agrees with Defendants and concludes that Plaintiffs have not alleged sufficient facts to make a plausible showing that Defendants agreed or conspired to fix broker commissions by virtue of the adoption, enforcement, or agreement with FMLS's rules.  The only evidence or allegation of any agreement put forward by Plaintiffs is that of each Defendant Broker and Agent's agreement to abide by FMLS's rules, which require them to list properties in the Compulsory Area on the FMLS database and pay FMLS a fee when the property is sold.  Despite Plaintiffs' allegation that this fee establishes a floor on broker commissions, the Court cannot plausibly infer a conspiracy or agreement on the part of all Defendants to fix broker commissions from the fact that each Defendant Broker and Agent has independently agreed to pay FMLS the fee it requires for the use of its services.

Furthermore, Plaintiffs do not allege any facts regarding how FMLS creates its rules, much less any facts showing that all of the Defendants played a role in this process.  This is fatal to Plaintiffs' argument that "through the adoption and enforcement of Rules 6, 7, 14, and 16, the Hidden Settlement Fees, and the Kickbacks, the Defendants (a) agreed to and did fix, raise, maintain, and stabilize commissions paid from settlements by purchasers and

45

sellers of real estate listed on the FMLS database by at least the amount of the Hidden Settlement Fee . . . ." (Am. Compl., Dkt. No. [47] at 340.) Absent any allegation connecting the Defendant Brokers, Agents, and Boards to the process by which FMLS sets its rules, the Court cannot infer from the existence of the rules that all Defendants together agreed or conspired to create the rules and thereby fix broker commissions. The allegations of the Amended Complaint do not make a plausible showing that FMLS's rules are anything other than the product of unilateral decision making on the part of FMLS.[22]

---

[22] Despite Plaintiffs' argument to the contrary (see Pls. Resp. in Opp'n Defs.' Mot. to Dismiss, Dkt. No. [60-1] at 21-24), the allegations concerning the Boards of Realtors do not plausibly connect the Boards to the process by which FMLS sets its rules. The Court has specifically considered the allegations that Plaintiffs rely on in their Response brief (paragraphs 167, 171-172, 178, 334, and 342 of the Amended Complaint), as well as other allegations in the Amended Complaint regarding the Boards of Realtors (paragraphs 34, 35, 37-39, 40, 148-150, and 176). None of these allegations gives rise to a plausible inference that the Boards of Realtors participated with FMLS in setting its rules, or conspired or agreed with FMLS to create rules so as to fix broker commissions.

In this respect, Boland v. Consolidated Multiple Listing Service, Inc., No. 3:09-1335 (D.S.C. March 23, 2011) is distinguishable. In Boland, the court considered allegations that certain rules and practices of an MLS violated Section 1. The court found sufficient factual allegations to plausibly suggest an agreement among the defendant members of the MLS's board where the plaintiffs alleged that "the Defendant Board members actually met and reached agreements to adopt [the challenged] by-laws and regulations" "for the purpose of restraining competition."

The allegations in this case that come the closest to the allegations in Boland

Finally, Plaintiffs seem to put much stock in the allegation that "FMLS changed its method of calculating the Hidden Settlement Fee to fix its fee and preserve its share of revenue if commissions on a particular transaction fell below 6%." (Am. Compl., Dkt. No. [47] ¶¶ 83-85.) However, this allegation again concerns only unilateral conduct by FMLS and says nothing of any agreement among all Defendants to fix broker commissions. The Court cannot infer such an agreement from what is simply a unilateral business decision. Plaintiffs further argue that FMLS changed its fee for the purpose of "stabilizing the Hidden Settlement Fee and keeping commissions from falling below 6%." (Pls.' Resp. in Opp'n Defs.' Mot. to Dismiss, Dkt. No. [60-1] at

---

are still insufficient to connect all Defendants to the setting of FMLS's rules. (See, e.g., Am. Compl., Dkt. No. [47] ¶ 37 ("FMLS has approximately 24 stockholder members."); ¶ 38 ("These stockholder members are among the largest and most successful brokers in Georgia."); ¶ 39 ("Brokers with the same large brokerage firms that own and control FMLS are members of and have significant influence upon, and in most cases control, the Defendant Boards."); ¶ 175 ("Most, if not all, of the Defendant Brokers are or were during the relevant period of time, members of the Atlanta Board of Realtors."); ¶ 177 ("Each of the Defendant Brokers and Defendant Agents is or was during the relevant period of time a member of the Gainesville-Hall County Board of Realtors."); ¶178 ("The Defendant Boards were and are fully aware of, and have supported, condoned, and acquiesced in, Rules 6, 7, 14, and 16, the Hidden Settlement Fees, and the Kickbacks.).) There is no allegation in the Amended Complaint that FMLS, the Boards of Realtors, and the Defendant Brokers and Agents agreed, expressly or tacitly, to create FMLS's Rules with the purpose or effect of restraining competition.

47

15.) The Court finds this argument puzzling: FMLS originally calculated its fee as a percentage of broker commissions, but changed it to a percentage of the property sale price (Am. Compl., Dkt. No. [47] at 83-85); this change would seem to insulate FMLS from fluctuations in broker commissions and thus make the level of broker commissions irrelevant to FMLS.  In any event, regardless of FMLS's motive, its decision to change the basis of its fee was a unilateral decision that does not plausibly suggest an agreement by all Defendants to fix broker commissions.[23]

---

[23] The other MLS cases Plaintiffs cite do not alter the Court's analysis.  First, Plaintiffs rely on Hartrampf I as establishing that FMLS's rules and regulations "constitute[ ] an actionable agreement under Section 1."  (Pls.' Resp. in Opp'n Defs.' Mot. to Dismiss, Dkt. No. [60-1] at 13 (citing Hartrampf I, No. C83-522A, 1983 WL 1852 (N.D. Ga. June 16, 1983)).)  In Hartampf I, however, the court found antitrust violations based on specific rules that prohibited members of FMLS from being a member or affiliate of, or from using the services of, any other listing service.   1983 WL at *2, *4.  Hartrampf I thus does not stand for the proposition that all of FMLS's Rules and Regulations constitute agreements that restrain competition.  The remaining cases that Plaintiffs cite in a footnote of their Response brief are similarly distinguishable.  See United States v. Nat'l Ass'n of Realtors, No. 05 C 5140, 2006 WL 343263, at *2-4, *14 (N.D. Ill. Nov. 27, 2006) (denying motion to dismiss Sherman Act challenge to MLS rule designed to impede competition from real estate brokers who provided consumers access to listings over the Internet as opposed to in traditional print formats); Austin Board of Realtors v. E-Realty, Inc., No. Civ. A-00-CA-154 JN, 2000 WL 34239114, at *4-5 (W.D. Tex. March 30, 2000) (granting preliminary injunction against rule prohibiting distribution of MLS data via websites and thus restraining competition from Internet real estate brokers).

48

2.      *FMLS's Collection and Dissemination of Commission Data*

Second, Plaintiffs argue that a price-fixing agreement regarding broker

commissions plausibly may be inferred from FMLS's alleged collection and

dissemination of broker commission data.  (Pls.' Resp. in Opp'n Defs. Mot. to

Dismiss, Dkt. No. [60-1] at 20.)  Plaintiffs argue,

> FMLS requires its broker Members to submit to FMLS not only
> the first page of the HUD-1 Settlement Statement for each of their
> closings, but also the second page that reports the commissions
> paid in the settlement.  Moreover, FMLS gives its broker Members
> access to this commission data.  By thus freely sharing among
> themselves this highly sensitive, ostensibly proprietary information
> on commissions actually paid on FMLS transactions . . . the
> Defendant Brokers and Agents inevitably facilitate collusion on
> commission rates.

(Id.)  Plaintiffs point to the following allegations in the Amended Complaint as

supporting this theory of a Section 1 agreement:

- FMLS requires Member Brokers to submit both pages of the
  HUD-1 Settlement Statement within 72 hours of closing.
  (Dkt. No. [47] ¶ 116.)

- FMLS's receipt of page 2 of the HUD-1 Settlement
  Statement enables it to collect commission information on
  closed sales.  (Id. ¶ 117.)

- Commission information is not redacted from the HUD-1
  Settlement Statements before they are submitted to FMLS.
  FMLS uses this commission information to assist the

49

Defendant Brokers and Agents, in combination with each other, in stabilizing and maintaining inflated commission rates.  (<u>Id.</u> ¶ 118.)

•      FMLS provides its Member Brokers with access to the commission information it compiles.  (<u>Id.</u> ¶ 119.)

•      Defendants colluded on commission rates during the relevant time period.  (<u>Id.</u> ¶ 120.)

The inference Plaintiffs ask the Court to make is again unsupported by the facts alleged in the Amended Complaint.  As a threshold matter, the allegation in paragraph 120 is merely a legal conclusion that the Court does not accept as true on a motion to dismiss.  The allegations of fact are similarly insufficient.  The Court cannot plausibly infer that all Defendants agreed or conspired to fix broker commissions from the fact that FMLS collects and makes available to the Defendant Brokers and Agents the HUD-1 settlement statements, which contain commission information.  The fact that persons have an opportunity to conspire does not give rise to a *plausible* inference that they, in fact, did conspire.  <u>See, e.g.</u>, <u>In re Delta/AirTran Baggage Fee Antitrust Lit.</u>, 733 F. Supp. 2d at 1359 ("'A plaintiff . . . cannot state an antitrust claim by showing only that the Defendants made price information publicly available and thus had the opportunity to conspire . . . .'") (quoting <u>In re LTL Shipping Servs.</u>

50

Antitrust Lit., No. 1:08-MD-01895-WSD, 2009 WL 323219, at *8 (N.D. Ga. Jan. 28, 2009)).

The factual allegations that come closest to stating a claim under this theory are those contained in paragraph 118: "FMLS uses this commission information to assist the Defendant Brokers and Agents, in combination with each other, in stabilizing and maintaining inflated commission rates." However, given the absence of any evidence of agreement by or between the Defendant Brokers and Agents to fix broker commissions (see discussion at subsection 1, supra), the allegation that FMLS assists the Brokers and Agents in this effort through the use of commission data is unavailing.

The Court concludes that Plaintiffs have failed to allege sufficient facts to make a plausible showing that FMLS, the Defendant Brokers and Agents, and the Boards of Realtors agreed or conspired with one another to fix broker commissions, either through the FMLS rules or through FMLS's collection and dissemination of commission data. The inferences the Court would have to draw to reach this conclusion are not supported by the facts alleged in the Amended Complaint. The Court therefore grants Defendants' Motion to

Dismiss with respect to the Sherman Act claims contained in Count III of the

Amended Complaint.

**IV.    Unfair Competition** (All Defendants) (Count IV)

In Count IV of the Amended Complaint, Plaintiffs assert a claim against

all Defendants for unfair competition under Georgia law.  In their Response in

opposition to Defendants' Motion to Dismiss, Plaintiffs explain their unfair

competition claim as follows:

> Put bluntly, Plaintiffs' claim of unfair competition under Georgia law, like all their other claims, targets FMLS's Rules and Regulations *through which Defendants have contracted and agreed to impose and enforce the Hidden Settlement Fees and Kickbacks for the purpose, and with the effect, of fixing commissions, stifling innovative alternative fee arrangements, and otherwise restricting competition* in the market for real estate brokerage services in at least the Compulsory Area.

(Dkt. No. [60-1] at 25 (emphasis added).)  While the Court must decide a

motion to dismiss based on the facts alleged in the Amended Complaint, the

Court will accept Plaintiffs' own explanation of their legal theory for purposes

of determining whether they have stated a claim.  In light of Plaintiffs'

explanation of their unfair competition claim, it is clear to the Court that this

claim rests on the same legal theory as Plaintiffs' Sherman Act claim.

AO 72A
(Rev.8/82)

Accordingly, for the reasons set forth in Section III, <u>supra</u>, the Court finds that Plaintiffs have failed to allege sufficient facts to state a claim of unfair competition.  The Court thus grants Defendants' Motion to Dismiss as to this Count.

**V.     UDTPA** (Defendant Brokers) (Count V)

In Count V of the Amended Complaint, Plaintiffs seek injunctive relief against the Defendant Brokers, alleging that the Defendant Brokers have violated Georgia's Uniform and Deceptive Trade Practices Act (UDTPA), O.C.G.A. § 10-1-370, *et seq.*, by failing to disclose to Plaintiffs the existence of FMLS Rules 6, 7, 14, 16, the Hidden Settlement Fees, and the Kickbacks, thereby failing to disclose to Plaintiffs the true amount and basis of calculating their compensation (i.e., commission).[24]  (Am. Compl., Dkt. No. [47] ¶¶ 363-364.)  Defendants move to dismiss Plaintiffs' UDTPA claim on the ground that the named Plaintiffs lack individual standing to seek injunctive relief, and on

---

[24] To the extent Plaintiffs request injunctive relief against FMLS, the Court agrees with Defendants (<u>see</u> Defs.' Mot. to Dismiss, Dkt. No. [54-8] at 67) that such relief would be improper, as Plaintiffs have asserted their UDTPA claim only against the Defendant Brokers and not FMLS.

the ground that they have failed to plead sufficient facts to state a claim.  The

Court considers each argument in turn.

A.    Standing

Defendants first argue that Plaintiffs lack standing to seek injunctive

relief under the UDTPA because they have failed to allege a likelihood of future

injury caused by the Defendant Brokers' conduct.  (Defs.' Joint Mot. to

Dismiss, Dkt. No. [54-8] at 67.)  Under the UDTPA, "A person likely to be

damaged by a deceptive trade practice of another may be granted an injunction

against it under the principles of equity and on terms that the court considers

reasonable."  O.C.G.A. § 10-1-373(a).  Injunctive relief is thus the only remedy

available under the UDTPA.  Cartrett v. Landmark Lodge, Inc., 560 S.E.2d 101,

106 (Ga. Ct. App. 2002).  To have standing to seek injunctive relief under the

UDTPA, a plaintiff must show, under its plain language, that she is "likely to be

damaged" in the future by some deceptive trade practice of the defendant.  See,

e.g., Silberstein v. Proctor & Gamble Mfg. Co., No. CV 108-003, 2008 WL

4889677, at *4 (S.D. Ga. Nov. 12, 2008) ("In order to obtain injunctive relief

under Georgia's UDTPA, a plaintiff must show that he is likely to be damaged

by the defendant's deceptive trade practice.  A plaintiff who demonstrates past

harm, but does not allege ongoing or future harm, has not shown that he is likely to be damaged within the meaning of section 10-1-373(a)").[25]   The requirement of individual standing exists even when the plaintiff represents a putative class of plaintiffs.  Mills v. Foremost Ins. Co., 511 F.3d 1300, 1307 (11th Cir. 2008).

Plaintiffs have alleged that the Hidden Settlement Fees and Kickbacks "harm consumer welfare," and that the Kickbacks will cause the Defendant Brokers to comply with FMLS rules and provide future listings on the FMLS database.  (Am. Compl., Dkt. No. [47] ¶¶ 161, 164.)  In their Response brief, Plaintiffs argue that "[p]roperties listed on FMLS' database are being bought and sold every day and, at least at some point in the future, the properties of Plaintiffs will be bought and sold."  (Pls.' Resp. in Opp'n Defs.' Mot. to Dismiss, Dkt. No. [60-1] at 32.)  The Court finds the allegations in the Amended Complaint sufficient to support this argument and to show that the

---

[25] This requirement also applies with respect to Constitutional standing under Article III.  To have Article III standing to seek injunctive relief, a plaintiff must satisfy three requirements:  first, "he must demonstrate that he is likely to suffer future injury; second, that he is likely to suffer such injury at the hands of the defendant; and third, that the relief the plaintiff seeks will likely prevent such injury from occurring."  Cone Corp. v. Florida Dept. of Transp., 921 F.2d 1190, 1203-04 (11th Cir. 1991).

AO 72A
(Rev.8/82)

named Plaintiffs face a threat of future injury as a result of the Defendant

Brokers' conduct.  Accordingly, the Court concludes that Plaintiffs have

standing to seek injunctive relief under the UDTPA.

      B.     <u>Stating a Claim under the UDTPA</u>

Defendants next move to dismiss the UDTPA claim on grounds that

Plaintiffs have failed to plead sufficient facts to state a plausible violation of the

UDTPA.  (Defs.' Mot. to Dismiss, Dkt. No. [54-8] at 68.)  As stated above, the

UDTPA affords relief to those who are injured by a "deceptive trade practice"

of another.  O.C.G.A. § 10-1-373.  The Act defines "deceptive trade practices"

as including various forms of conduct, including "any other conduct which

similarly creates a likelihood of confusion or of misunderstanding."  <u>Id.</u> § 10-1-

372(a)(12).

In the Amended Complaint, Plaintiffs allege that the Defendant Brokers

violated the UDTPA by "creating a likelihood of confusion or

misunderstanding as to the true amount and basis of calculation of the

Defendant Brokers' commission . . . ."  (Dkt. No. [47] ¶ 364.)  In their

Response brief, Plaintiffs explain the theory of this claim as follows: " [A]s a

result of the Defendant Brokers' failure to disclose the Hidden Settlement Fees

and the Kickbacks, the Defendant Brokers failed to disclose to Plaintiffs the true amount and basis of the Defendant Brokers' compensation, and . . . their compensation was understated by the amount of the Kickbacks." (Pls.' Resp. in Opp'n Defs.' Mot. to Dismiss, Dkt. No. [60-1] at 38.) The Court finds sufficient factual allegations in the Amended Complaint to support this theory and state a plausible claim for relief under the UDTPA. In particular, the Court notes the following allegations:

- After the closing of the subject transactions, the Defendant Brokers paid Hidden Settlement Fees from the commissions received from such closing and thereafter received Kickbacks on account of such settlements from FMLS. The Defendant Brokers understated their compensation reported on the HUD-1 Settlement Statement by the amount of the Kickbacks. (Id. ¶ 363.)

- [T]he Defendant Brokers [failed] to disclose to the Plaintiffs on the Settlement Statement or in a supplemental document at the time of settlement, the existence of Rules 6, 7, 14, 16, and/or the Hidden Settlement Fees, and the Kickbacks . . . . (Id. ¶ 362.)

- Brokers . . . are required to disclose to their principals (i.e., buyers and sellers) on the HUD-1 Settlement Statement the true amount and basis of calculating their compensation. (Id. ¶ 114.)

- Despite being funded by settlement proceeds disbursed at closing, the Hidden Settlement Fees are remitted to FMLS

after closing and are not disclosed to purchasers and sellers of residential real estate on the HUD-1 Settlement Statement or otherwise.  (Id. ¶ 124.)

- • The Kickbacks are funded by settlement proceeds but are not disclosed to purchasers or sellers of 1 real estate [sic] on the HUD-1 Settlement Statement or otherwise.  (Id. ¶ 128.)

- • The Defendant Brokers systematically and routinely misrepresented and understated the true amount and basis for calculation of the compensation arising from a given settlement of real estate that was listed on the FMLS database in that they failed to disclose the Kickback.  (Id. ¶ 153.)

These factual allegations, taken as true, show that the Defendant Brokers understated the amount of their commission by the amount of the alleged Kickbacks.  Accordingly, Plaintiffs have stated a plausible claim for relief under the UDTPA's prohibition against conduct in trade that "creates a likelihood of confusion or of misunderstanding."  The Court thus denies Defendants' Motion to Dismiss as to this Count.

## VI.  Unjust Enrichment and Money Had and Received (Defendant FMLS) (Count VI)

In Count VI of the Amended Complaint, Plaintiffs assert a claim against

58

FMLS for unjust enrichment and money had and received.[26]  "Unjust

enrichment is an equitable concept and applies when as a matter of fact there is

no legal contract, but when the party sought to be charged has been conferred a

benefit by the party contending an unjust enrichment which the benefitted party

equitably ought to return or compensate for."  St. Paul Mercury Ins. Co. v.

Meeks, et al., 508 S.E.2d 646, 648 (Ga. 1998).  In other words, "[t]he theory of

unjust enrichment applies when there is no legal contract and when there has

been a benefit conferred which would result in an unjust enrichment unless

compensated."  Smith Serv. Oil Co. v. Parker, 549 S.E.2d 485, 487 (Ga. Ct.

App. 2001).  Thus, to state a claim for unjust enrichment, a plaintiff must allege

that the defendants "have received money belonging to the plaintiff or to which

[the plaintiff] is in equity and good conscience entitled."  Haugabook v. Crisler,

677 S.E.2d 355, 359 (Ga. Ct. App. 2009).

Plaintiffs allege that FMLS has been unjustly enriched at Plaintiffs'

expense through its receipt of Hidden Settlement Fees undisclosed to Plaintiffs

---

[26] As Defendants point out, "[T]hese are not separate causes of action.  An action for money had and received is merely one form of action to recover damages based on unjust enrichment."  Nat'l City Bank of Rome v. Rusbin, 332 S.E.2d 678, 683 (Ga. Ct. App. 1985).

and funded by commissions Plaintiffs paid the Defendant Brokers and Agents. (Am. Compl., Dkt. No. [44] paras. 367-375.)  Defendants argue that Plaintiffs have failed to state a claim by failing to allege (1) that Plaintiffs are the "true owners" of the money received by FMLS, (2) that equity requires FMLS to return the money, or (3) that Plaintiffs conferred on FMLS any benefit directly. (Defs.' Mot. to Dismiss, Dkt. No. [54-8] at 72-77.)  The Court finds these arguments to be without merit.

As Plaintiffs point out in their Response brief (Dkt. No. [60-1] at 38-46), Plaintiffs have alleged that pursuant to FMLS Rule 16, the Defendant Brokers paid FMLS a Hidden Settlement Fee upon the closing of any sale of property listed on the FMLS database.  (Am. Compl., Dkt. No. [47] para. 108.)  The Amended Complaint is replete with allegations that this Hidden Settlement Fee is funded by the real estate commissions that Plaintiffs pay the Defendant Brokers and Agents (id. ¶¶ 88, 95, 123, 270), and further that the Hidden Settlement Fee establishes a "floor" on commission rates and thus is passed on to Plaintiffs in the form of higher fees and commissions (id. ¶¶ 92, 181). Plaintiffs further allege that this Fee is not disclosed to Plaintiffs, and that Plaintiffs had no contractual obligation to pay FMLS any sum of money.  (Id.

60

¶¶ 61, 369.)  Finally, Plaintiffs allege that FMLS performed no services in exchange for the Hidden Settlement Fees and therefore was not entitled to the money received from Plaintiffs.  (Id. ¶¶ 81, 96.)

These allegations are sufficient to state a claim for unjust enrichment against FMLS, as Plaintiffs have alleged that they conferred a benefit on FMLS, through the Defendant Brokers and Agents,[27] to which FMLS was not entitled. Accordingly, the Court denies Defendants' Motion to Dismiss as to this Count.

## VII.   Negligent Misrepresentation (Defendant Brokers and Agents) (Count VII)

In Count VII of the Amended Complaint, Plaintiffs assert a claim for negligent misrepresentation against the Defendant Brokers and Agents.  The tort of negligent misrepresentation under Georgia law has three essential elements:  "(1) the defendant's negligent supply of false information to

---

[27] The Court notes that contrary to Defendants' argument, to maintain an action for unjust enrichment, it is not necessary that the plaintiff allege a direct payment by the plaintiff to the allegedly unjustly-enriched defendant.  See, e.g., Haugabook, 677 S.E.2d at 369 ("Furthermore, it is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner.").

foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Hendon Properties, LLC v. Cinema Development, LLC, 620 S.E.2d 644, 649 (Ga. Ct. App. 2005). "Justifiable reliance is thus an essential element of a claim asserting negligent misrepresentation." Id. Defendants move to dismiss this Count on grounds that Plaintiffs have failed to plead sufficient facts to make a plausible showing of these elements. (Defs.' Mot. to Dismiss, Dkt. No. [54-8] at 78-80.)

In the Amended Complaint, Plaintiffs first allege that the Defendant Brokers and Agents had a duty, under BRETTA, O.C.G.A. sec. 10-6A-1, *et seq.*, to "disclos[e] to [Plaintiffs] adverse material facts of which the [Defendants] ha[d] actual knowledge concerning the transaction, timely account[ ] for all money and property received in which [Plaintiffs] ha[d] or may have an interest, [and] disclose[ ] to [Plaintiffs] the true amount and basis of calculation of the brokers' compensation . . . ." (Dkt. No. [47] ¶ 377.) Plaintiffs thus allege that the Defendant Brokers and Agents had a duty to disclose FMLS Rules 6, 7, 14, and 16 and the Hidden Settlement Fees, and that the Defendant Brokers had the added duty of disclosing to Plaintiffs the

existence and amount of the Kickbacks.  (Id. ¶¶ 381-382.)  Second, Plaintiffs

allege that the Defendant Brokers and Agents, by failing to disclose the

foregoing Rules, Hidden Settlement Fees, and Kickbacks, "did not timely and

properly inform the Plaintiffs of the true amount and basis of calculation of

their compensation, and did not timely and properly account for all money and

property received in which the Plaintiffs had an interest with respect to the

settlements at issue."  (Id. ¶ 383.)  The Court finds these allegations sufficient to

make a plausible showing that the Defendant Brokers and Agents breached a

duty to disclose information to Plaintiffs.

With regard to the second element of negligent misrepresentation,

reasonable or justified reliance, Plaintiffs make the following allegations in the

Amended Complaint:

- The Plaintiffs reasonably relied on the brokerage engagement agreement and HUD-1 Settlement Statement as accurately stating that a commission would be paid to the Defendant Brokers and had no basis for discovering that, in fact, a portion of the commission would be paid to FMLS within 10 days after closing.  (Dkt. No. [47] ¶ 387.)

- The Plaintiffs did justifiably and reasonably rely on this false and misleading information to their detriment.  (Id. ¶ 390.)

The Court finds these allegations sufficient, at the motion to dismiss stage, to make a plausible showing that Plaintiffs did in fact rely to their detriment on the allegedly misleading information provided by the Defendant Brokers and Agents.

Finally, with regard to the last element of negligent misrepresentation, Plaintiffs allege, "The negligent misrepresentations by the Defendant Brokers and the Defendant Agents as to the correct amount of commission the Plaintiffs would pay them proximately caused the Plaintiffs to suffer damages . . . ." (Id. ¶ 391.)  Again, at the motion to dismiss stage, this allegation is sufficient.  The Court thus finds that Plaintiffs have alleged sufficient facts to state a claim against the Defendant Brokers and Agents for negligent misrepresentation. Accordingly, the Court denies Defendants' Motion to Dismiss as to this Count.

**VIII.  Civil Conspiracy** (All Defendants) (Count VIII)

Finally, Plaintiffs allege in Count VIII of the Amended Complaint that all Defendants engaged in a conspiracy to "actively suppress the existence of Rules 6, 7, 14, 16, the Hidden Settlement Fees, and the commingling and sharing of the Hidden Settlement Fees and/or the Kickbacks from the knowledge of the Plaintiffs."  (Dkt. No. [47] ¶ 394.)  A conspiracy exists when "two or more

64

persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design." Parrish v. Jackson W. Jones, P.C. et al., 629 S.E.2d 468, 472 (Ga. Ct. App. 2006). "The essential element of conspiracy is the charge of a common design." Id. Furthermore, "[t]here can be no conspiracy without a purpose, express or implied, to do something unlawful, oppressive, or immoral. . . ." R.R.R. Ltd. P'ship v. Investguard, Ltd. et al., 463 S.E.2d 735, 736 (Ga. Ct. App. 1995).

Defendants advance several arguments in support of their motion to dismiss Plaintiffs' conspiracy claim, including that Plaintiffs have failed to allege sufficient facts to make a plausible showing of any agreement or "mutual understanding" among all Defendants to suppress or conceal the aforementioned rules and fees from Plaintiffs. (Dkt. No. [54-8] at 81.) In response, Plaintiffs contend,

> Plaintiffs have more than met their burden to allege sufficient facts to support a plausible inference of a price fixing conspiracy among Defendants in violation of the Sherman Act and Georgia law. These factual allegations . . . are equally applicable to Plaintiffs' civil conspiracy claim.

(Pls.' Reply in Opp'n Defs.' Mot. to Dismiss, Dkt. No. [60-1] at 50-51.)  The Court agrees with Defendants.  Just as Plaintiffs failed to allege sufficient facts

to show a plausible agreement to fix broker commissions in violation of the

Sherman Act, the Court finds that Plaintiffs have failed to allege sufficient facts

to show a plausible agreement on the part of all Defendants to engage in

tortious conduct under Georgia law.

Additionally, the parties agree that Plaintiffs' conspiracy claim cannot

survive if the state law tort claims presented in Counts IV through VII fail.  See,

e.g., Miller v. Lomax, 596 S.E.2d 232, 242 (Ga. Ct. App. 2004) ("Absent the

underlying tort, there can be no liability for civil conspiracy.").  As stated

above, the state law tort claims that have survived Defendants' Motion to

Dismiss are the claims under the UDTPA against the Defendant Brokers (Count

V), for unjust enrichment against Defendant FMLS (Count VI), and for

negligent misrepresentation against the Defendant Brokers and Agents (Count

VII).  None of these claims, however, can sustain a claim for conspiracy.

First, with regard to Plaintiffs' UDTPA claim against the Defendant

Brokers, and as explained in connection with Plaintiffs' Sherman Act claim in

Part III, supra, the Court finds that Plaintiffs have failed to allege sufficient

facts to make a plausible showing of any agreement among the Defendant

Brokers.  Absent an agreement, there can be no conspiracy.  Similarly,

AO 72A
(Rev.8/82)

Plaintiffs' claim for unjust enrichment against Defendant FMLS cannot sustain a claim for conspiracy given that only one actor, FMLS, is alleged to have engaged in the tortious conduct.  As explained above, a conspiracy requires the concerted action of two or more persons.  Finally, Plaintiffs' claim for negligent misrepresentation cannot sustain the conspiracy claim because persons cannot conspire to commit negligence.  See R.R.R. Ltd. P'ship, 463 S.E.2d at 736 ("[A] conspiracy to commit negligence [is] a 'non sequitur.'").  On the contrary, there can be no conspiracy without a common purpose to do something unlawful.

Accordingly, the Court grants Defendants' Motion to Dismiss as to this Count.

## Conclusion

In accordance with the foregoing, the Court hereby **GRANTS** Defendants' Joint Motion to Dismiss the Amended Complaint [54] as to the following claims and Counts: Plaintiffs' RESPA § 8(a) claim contained in Count I as against the Defendant Agents; Plaintiffs' Sherman Act claim contained in Count III; Plaintiffs' state law Unfair Competition claim contained

in Count IV; and Plaintiffs' state law Civil Conspiracy claim contained in Count VIII.

The Court hereby **DENIES** Defendants' motion as to all other claims and Counts, namely: Plaintiffs' RESPA § 8(a) claim contained in Count I  as against FMLS and the Defendant Brokers; Plaintiffs' RESPA § 8(b) claim contained in Count I; Plaintiffs' RESPA § 8(c)(4) claim contained in Count II; Plaintiffs' state law UDTPA claim contained in Count V; Plaintiffs' state law claim for Unjust Enrichment and Money Had and Received contained in Count VI; and finally, Plaintiffs' state law claim for Negligent Misrepresentation contained in Count VII.

In light of these rulings, no claims remain against the Defendant Boards of Realtors, which are accordingly DISMISSED from this action.

**SO ORDERED**, this   18th   day of January, 2012.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

68