# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

HEATHER Q. BOLINGER, *et al.*,  :
           :
  Plaintiffs,     :
           :
  v.        :  CIVIL ACTION NO.
           :  2:10-CV-211-RWS
FIRST MULTIPLE LISTING  :
SERVICE, INC. *et al.*,   :
           :
  Defendants.    :

## ORDER

This case comes before the Court on Defendants' Motion to Strike
Plaintiffs' Sur-Rebuttal Expert Reports [257], Plaintiffs' Motion for Leave to
File a Second Amended Complaint [266], Defendants' Motion for Summary
Judgment [272], Plaintiffs' Motion to Strike the Testimony of Plaintiffs'
Withdrawn Expert, Grant Mitchell [289], Plaintiffs' Motion to Strike
Paragraphs Eleven (11) through Thirteen (13) of the Affidavit of Frederick G.
Boynton [290], Plaintiffs' Motion for Oral Argument [303], and Defendants'
Motion for Order or for Leave to File a Reply to Plaintiffs' Response to
Statement of Undisputed Material Facts in Support of Defendants' Joint Motion

for Summary Judgment [323].  After reviewing the record, the Court enters the following Order.

## Background

Plaintiffs Heather Q. Bolinger, Paul A. Terry, and Anne M. Terry assert claims under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*., and under state law in regard to Defendants' alleged unlawful kickback and fee-splitting scheme.  Plaintiffs bought and sold homes through Defendant Brokers and Agents, who used a listing service provided by Defendant First Multiple Listing Service, Inc. ("FMLS").  Plaintiffs allege that Defendants engaged in a quid pro quo arrangement whereby the Brokers and Agents referred business to FMLS in exchange for kickbacks in the form of Patronage Dividends.  Notwithstanding the voluminous record, the Court finds only the following facts essential to resolving Plaintiffs' claims.

## I.    FMLS's Business Model

First Multiple Listing Service maintains an electronic database on which its members—licensed real estate brokers representing both buyers and sellers—may list and find properties.  (Defs.' Statement of Material Facts ("SMF"), Dkt. [272-1] ¶ 2.)  FMLS does not market its services to individual

buyers and sellers.  (Id. ¶ 31.)  Real estate brokers who pay to join FMLS are known as Principal Members, and licensed real estate sales agents working with Principal Members must also join FMLS as Associate Members.  (Id. ¶¶ 4-5.) Defendant Brokers and Agents were all Principal and Associate Members at the time of Plaintiffs' transactions in October and November 2009.  (Id. ¶¶ 6-7.)

Generally, Principal Members like Defendant Brokers are required by FMLS to list all real estate for sale in a particular geographic area on the FMLS Database.  (Id. ¶¶ 37-38.)  When a property listed on FMLS is bought or sold, each Principal Member involved in the transaction must pay FMLS a Sold Fee equal to .12% of the sales price.  (Id. ¶¶ 44, 47.)  Thus, if one Principal Member represents the buyer in a transaction and another Principal Member represents the seller, both Principal Members pay FMLS a Sold Fee.  These Sold Fees form the basis of Plaintiffs' fee-split claim.

Each month, FMLS pays its Principal Members Patronage Dividends based on the amount of available cash from Sold Fees and other revenues relative to its anticipated short-term expenses.  (Id. ¶ 69.)  The Patronage Dividends are divided among Principal Members on a pro rata basis according to each Principal Member's pro rata contribution to the total amount of Sold

Fees FMLS collected in the preceding twelve-month period. (Id. ¶ 70.)

Defendants assert that Patronage Dividends are a return of excess cash on hand,

but Plaintiffs characterize them as kickbacks. The Court next explains how the

FMLS model worked in connection to Plaintiffs' real estate transactions. All

Brokers mentioned below are Defendants in this action and are Principal

Members of FMLS.

## II. Plaintiffs' Transactions

### A. Heather Bolinger

In August 2009, Bolinger engaged Peggy Slappey Properties, Inc.

("PSP") to help her locate property to purchase, although they did not enter into

a written agreement. (Id. ¶ 82.) Bolinger later purchased a piece of property

that PSP located using FMLS. (Id. ¶¶ 83-84.) The sellers of that property had

agreed to pay their broker, Atlanta Partners, 6% of the sale price, and Atlanta

Partners in turn agreed to share 3% of the sale price with any cooperating

broker (here PSP). (Id. ¶ 87.) During negotiations, Atlanta Partners agreed to

reduce its share of the commission to 2% and thus charged the sellers a 5%

commission. (Id. ¶ 88.) Atlanta Partners shared an amount equal to 3% of the

sale price with PSP. (Id.) Bolinger paid no commission to either PSP or

4

Atlanta Partners, and Plaintiffs do not dispute that Bolinger did not directly pay

anything to FMLS.  (Id. ¶¶ 89-90.)  Bolinger's broker, PSP, received its share

of the commission from Atlanta Partners and deposited the commission in its

operating account.  (Id. ¶ 97.)  PSP then issued a check from its operating

account to FMLS for the Sold Fee.  (Id. ¶ 98.)

     B.     <u>Paul and Anne Terry</u>

The Terrys entered into two written agreements to buy and sell property

through Heritage Real Estate, Inc. ("Heritage").  (Id. ¶¶ 99, 126.)  The listing

agreement for the sale of their house provided for a commission of $195 plus

6% of the gross sale price.  (Id. ¶ 106.)  Heritage also agreed to share 3% of the

sale price with a cooperating broker.  (Id.)  Under the agreement, Heritage

further agreed to list the Terrys' home with FMLS and Georgia Multiple Listing

Service.  (Exclusive Seller Listing Agreement, Dkt. [273-48] at 3.)

The ultimate buyers of the home later found the Terrys' listing through

the FMLS Database.  (Defs.' SMF, Dkt. [272-1] ¶¶ 102, 104.)  The Terrys sold

their house, and Heritage ended up taking a lower commission of 6% of the net

sale price instead of 6% of the gross sale price.  (Id. ¶ 107.)  Heritage split half

that commission with Bueno and Finnick, Inc. ("B&F"), the buyers' broker,

while the Terrys' sales agent covered the $195 fee.  (Id.)  Heritage deposited the

commission funds into its operating account.  (Id. ¶ 113.)  Heritage then paid a

Sold Fee to FMLS out of its operating account.  (Id. ¶ 114.)

The same day the Terrys closed the sale of their home, they also finalized

the purchase of a new piece of property that Heritage had located through

FMLS.  (Id. ¶¶ 123-28.)  In their buyer brokerage agreement, the Terrys agreed

to pay Heritage a $195 commission if Heritage earned a cooperating-broker

commission of less than 3.5% of the sale price of the property.  (Id. ¶ 127.)  At

closing, the sellers paid a commission to their broker, Lanier Partners, and

Lanier Partners shared 3% of the sale price with Heritage.  (Id. ¶ 131.)  Because

that commission was less than 3.5%, the Terrys paid Heritage a flat commission

of $195 pursuant to the buyer brokerage agreement.  (Id. ¶ 133.)  Heritage then

paid FMLS a Sold Fee out of its operating account.  (Id. ¶ 142.)

## III.    Plaintiffs' Allegations

Plaintiffs allege that FMLS's payment of Patronage Dividends to its

members constitutes a kickback in exchange for referrals.  Under Plaintiffs'

theory, Brokers referred Plaintiffs' business by placing listings on the FMLS

Database and by paying Sold Fees after each sale.  Plaintiffs argue, moreover,

6

that Defendants split unearned commissions in violation of RESPA. First, Plaintiffs contend that because the Sold Fees FMLS collects exceed FMLS's operating costs by between 74% to 83%, that excess portion is unearned (a "front-end" split). (See Pls.' Resp., Dkt. [295] at 65-66.) Second, Plaintiffs state that because that excess portion of the Sold Fees is unearned, the use of those funds to pay Patronage Dividends is a second split of unearned commissions (a "back-end" split). Further, FMLS's members perform no service in return. (See id. at 71.)

Plaintiffs also assert that the Brokers and FMLS function together as affiliated business arrangements ("ABA") that Defendants failed to disclose in violation of RESPA. (See id. at 72.) Finally, Plaintiffs bring state-law claims of unjust enrichment, violation of Georgia's Uniform and Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 *et seq.*, and negligent misrepresentation. Defendants move for summary judgment on all claims.

## Discussion[1]

## I. Summary Judgment Legal Standard

---

[1]Because the parties' briefing is adequate to resolve the motions before the Court, the Court finds oral argument unnecessary and therefore **DENIES** Plaintiffs' Motion for Oral Argument [303].

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

8

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II. RESPA Claims

Congress passed RESPA in 1974 to regulate the costs to consumers in closing real estate transactions. In that regard, Congress found:

> [S]ignificant reforms in the real estate settlement process are
> needed to insure that consumers throughout the Nation are
> provided with greater and more timely information on the nature

and costs of the settlement process and are protected from
unnecessarily high settlement charges caused by certain abusive
practices that have developed in some areas of the country.

12 U.S.C. § 2601(a).

"One of the abusive practices that Congress sought to eliminate through

the enactment of RESPA was the payment of referral fees, kickbacks, and other

unearned fees." Sosa v. Chase Manhattan Mortg. Corp., 348 F.3d 979, 981

(11th Cir. 2003) (citing S. Rep. No. 93-866 (1974), reprinted in 1974

U.S.C.C.A.N. 6546, 6551).  To that end, Congress addressed kickbacks and

splitting of unearned fees in RESPA § 8.  See 12 U.S.C. § 2601(a)-(b).

Consumers may enforce these provisions through actions for damages.  See 12

U.S.C. § 2607(d).  Specifically, RESPA establishes that anyone who violates §

8 "shall be jointly and severally liable to the person or persons charged for the

settlement service involved in the violation in an amount equal to three times

the amount of any charge paid for such settlement service."  Id. § 2607(d)(2).

A.    Standing Issues Regarding Claims Against Lanier Partners, Atlanta
      Partners, and B&F

Defendants argue that Plaintiffs lack constitutional and statutory standing

to bring claims against the above Brokers because Plaintiffs did not have a

10

client relationship with them or pay them any fees. To possess Article III standing, a plaintiff must have an injury in fact, there must be a causal connection between the injury and the defendant's conduct, and the injury must be redressable by a court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). While the Brokers were parties to the transactions relevant to this litigation, as explained more fully in Part II.B. below, Plaintiffs did not pay them any commissions. In Bolinger's transaction, the sellers paid a commission to Atlanta Partners, their own broker, but Bolinger did not. In the Terrys' transactions, they paid Heritage a commission for the sale of their house, which Heritage in turn shared with B&F. And when they purchased their new home, the Terrys again paid only Heritage a flat fee while the sellers paid Lanier Partners a commission on the sale price. Therefore, Plaintiffs never paid commissions to Lanier Partners, Atlanta Partners, or B&F.

Plaintiffs fail to respond to Defendants' standing arguments with respect to these Brokers. In Plaintiffs' Response to Defendants' Statement of Material Facts [295-2], however, Plaintiffs do argue that they effectively paid these Brokers' commissions because they "funded the commissions paid by the [sellers] through the money [they] used to purchase the property since the

11

commissions were paid from the settlement proceeds of the transaction." (Dkt. [295-2] ¶ 89; <u>see also</u> <u>id.</u> ¶¶ 109, 111, 132.) That connection is a stretch. After all, RESPA limits the availability of civil damages to a "person or persons charged for the settlement service involved in the violation." <u>See</u> 12 U.S.C. § 2607(d)(2). Therefore, simply paying the purchase price does not establish an injury where Plaintiffs produce no evidence that these Brokers charged them for any services; rather, these Brokers' commissions were taken out of the sellers' proceeds from the transaction. Nor do Plaintiffs show that they paid these Brokers any fees that were illegally split with FMLS. Accordingly, Plaintiffs lack standing to bring claims against Lanier Partners, Atlanta Partners, and B&F, and they are entitled to summary judgment.

B. Section 8(a)

Plaintiffs' kickback claim against the remaining Brokers is rooted in RESPA § 8(a). That provision provides:

> No person shall give and no person shall accept any fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a). Plaintiffs allege that Defendant Brokers and Agents

AO 72A
(Rev.8/82)

referred business to FMLS in the form of listings and Sold Fees.  In exchange

for those referrals, FMLS paid kickbacks to the Brokers as Patronage

Dividends.  For their part, Defendants argue that they did not violate § 8(a)

because the Brokers never referred any services to FMLS in the first place.

> Both parties cite "Regulation X" for the definition of "referral":
>
> A referral includes any oral or written action directed to a person
> which has the effect of affirmatively influencing the selection by
> any person of a provider of a settlement service or business
> incident to or part of a settlement service *when such person will
> pay for such settlement service or business incident thereto or pay
> a charge attributable in whole or in part to such settlement service
> or business*.

12 C.F.R. § 1024.14(f)(1) (emphasis added).

Defendants insist that (1) they never influenced or required Plaintiffs to

do business with FMLS, and (2) Plaintiffs could not have been referred because

they did not pay for FMLS's services.  First, Defendants argue that they were

the only ones doing business with FMLS, not Plaintiffs, as the Brokers were in

an independent contractual relationship with FMLS under which the Brokers

were solely liable for the Sold Fees.  Plaintiffs respond that they too were

responsible for paying Sold Fees under the language of the brokerage contracts,

so they were influenced or required to select FMLS as a settlement service

13

provider.  (See Pls.' Resp., Dkt. [295] at 61-62.)  For example, the Terrys'

Exclusive Seller Listing Agreement included this clause: "Seller agrees to

indemnify [FMLS] from and against any and all claims, liabilities, damages or

losses arising out of or related to the listing and sale of Property."  (Dkt. [273-

48] at 3.)  But even if Plaintiffs could have been held liable for the Sold Fees, it

is undisputed that FMLS never invoked this clause to recover Sold Fees from

Plaintiffs.

In that vein, Defendants next emphasize that a referral under Regulation

X is only a referral "when [Plaintiffs] pay for such settlement service or

business incident thereto or pay a charge attributable in whole or in part to such

settlement service or business."  See 12 C.F.R. § 1024.14(f)(1).  And here,

Defendants argue, Plaintiffs could not have been referred to FMLS because they

never paid for any services it provided.

The Court agrees.  First, Bolinger could not have paid FMLS because

Bolinger did not pay any commission at all in connection with her single real

estate transaction.  Notably, the HUD-1 Settlement Statement prepared for

Bolinger's closing reflects several charges paid from Bolinger's funds at

settlement, including document-preparation charges and a mortgage-insurance

premium.  (Dkt. [273-45] at 3.)  The Statement further shows that the sellers paid a single commission from their funds at settlement that was split between PSP and Atlanta Partners.  (Id.)  Nowhere does FMLS appear on the HUD-1 Settlement Statement.  Bolinger therefore did not pay a charge to FMLS.

Second, the Terrys' HUD-1 Settlement Statements also reveal that they paid no charges to FMLS.  As sellers, the Terrys paid Heritage a commission from their funds at settlement.  (Dkt. [273-52] at 3.)  And as buyers, the Terrys paid a $195 commission to Heritage while the sellers paid a percentage sale-price commission to Heritage and Lanier Partners.  (Id.)  Yet the Settlement Statements record no charge paid to FMLS.

Of course, it is undisputed that the Brokers later paid Sold Fees to FMLS as a result of Plaintiffs' transactions.  And it is also undisputed that these fees were paid from the Brokers' general operations accounts, just like other business expenses.  But Plaintiffs' insistence that they in effect paid the Sold Fees by paying either the purchase price or commissions is unavailing.  According to the contract terms, Plaintiffs got the real estate services they contracted for and paid the commissions they agreed to (if they paid a commission at all).  Plaintiffs thus attempt to reclassify the nature of their

15

commission payments and Defendants' payment of Sold Fees to create material

factual disputes about their § 8(a) claim.  In doing so, Plaintiffs effectively rely

on their fee-splitting allegations to prove a payment under § 8(a)'s prohibition

against kickbacks for referred business when the consumer pays for that

business.  The argument thus goes: because Plaintiffs paid the Brokers'

commissions, and because the Brokers paid FMLS Sold Fees, Plaintiffs paid for

FMLS's services by paying commissions.[2]  But § 8(a) and Regulation X do not

contemplate an "effective referral," in Plaintiffs' words,[3] due to a Broker's

subsequent payment to a third-party service provider.  The fact remains that no

---

[2]Plaintiffs muddy the waters by arguing that Sold Fees are "deducted 'off the top' " from commissions through pay-at-close requests, thereby showing that Plaintiffs paid Sold Fees to FMLS.  (Pls.' Resp., Dkt. [295] at 62-63.)  Plaintiffs assert that in this manner commissions were "split among the broker, the agent, and FMLS." (Id.)  There is no evidence, however, that the Sold Fees were taken "off the top" of the commissions here.  While pay-at-close requests to issue checks to FMLS from settlement proceeds might resemble a payment from Plaintiffs for FMLS's services, no Broker to whom Plaintiffs paid a commission issued such a request.  (See Defs.' Reply, Dkt. [324] at 23-24.)  The HUD-1 Settlement Statements demonstrate this fact.

[3]At one point in their Response, Plaintiffs expand on their referral theory by arguing that buyers transacting business in the geographic area covered by FMLS cannot "opt out" of a transaction involving FMLS.  Thus, buyers in this area "are effectively 'referred' to FMLS because [.12%] of the sales price will be split from the commission and paid to FMLS, and 74-83% of such fee will be used to fund Patronage Dividends."  (Pls.' Resp., Dkt. [295] at 77.)  As the Court explains, this type of referral is not what RESPA and Regulation X contemplate.

Plaintiff ever paid a Sold Fee for FMLS's services; only the Brokers did.[4]

Consequently, Defendants are entitled to summary judgment on Plaintiffs' §

8(a) claim.

C.     Section 8(b)

Plaintiffs next argue that Defendants split unearned fees because the Sold

Fees the Brokers remit to FMLS exceed FMLS's operating costs, and the

Patronage Dividends in turn constitute a second illegal fee split of those

unearned fees because the Brokers perform no services in return.

Section 8(b) of RESPA provides:

No person shall give and no person shall accept any portion, split,
or percentage of any charge made or received for the rendering of a
real estate settlement service in connection with a transaction
involving a federally related mortgage loan other than for services
actually performed.

12 U.S.C. § 2607(b).

---

[4]Nor have Plaintiffs produced evidence that the commission was "a charge
attributable in whole or in part to" the services provided by FMLS.  See 12 C.F.R. §
1024.14(f)(1).  There is no evidence that the commissions were higher as a result of
the Sold Fees the Brokers paid.  This speculative connection between the Sold Fees
and commissions is insufficient to create a genuine dispute of material fact over
whether Plaintiffs were referred to FMLS as defined by Regulation X in exchange for
a kickback.

17

Defendants contend that even if they split fees with FMLS, FMLS performed services for Sold Fees. Plaintiffs respond that FMLS pays Patronage Dividends to Brokers in an amount equal to 74% to 83% of the Sold Fees it collects. Because that percentage is the amount of Sold Fees left over after paying operating costs and dividends to FMLS shareholders, Plaintiffs reason that FMLS's operating costs amount only to 17% to 26% of the Sold Fees it collects. Plaintiffs therefore argue that 74% to 83% of the Sold Fees are unearned.

Plaintiffs summarize their theory by asserting that they "are not challenging the Sold Fees as excessive; Plaintiffs are challenging these payments as the split of knowingly unearned fees." (Pls.' Resp., Dkt. [295] at 70-71.) Plaintiffs go on to explain that they are not trying to establish the reasonable value of FMLS's services. "Plaintiffs argue instead that 74% to 83% of the Sold Fees is for 'no, nominal or duplicative work' and is charged solely to fund kickbacks to brokers—an imbedded fee split." (Id. at 71.) That distinction appears to be without meaning. Even if the Court parsed the Sold Fees into earned and unearned components, Eleventh Circuit precedent establishes that a plaintiff may not sustain a § 8(b) claim in this manner.

18

In <u>Friedman v. Market Street Mortgage Corp.</u>, 520 F.3d 1289 (11th Cir. 2008), the plaintiffs argued that they could maintain a § 8(b) claim for excessive fees. <u>Id.</u> at 1297. The Eleventh Circuit rejected that argument, stating that the plain and unambiguous language of the statute precludes such an interpretation because § 8(b) only "prohibits the charging of fees other than for services actually performed." <u>Id.</u> The court explained: "[N]othing in the language authorizes courts to divide a 'charge' into what they or some other person or entity deems to be its 'reasonable' and 'unreasonable' components. Whatever its size, such a fee is 'for' the services rendered by the institution and received by the borrower." <u>Id.</u> (quoting <u>Kruse v. Wells Fargo Home Mortg., Inc.</u>, 383 F.3d 49, 56 (2d Cir. 2004)).

In <u>Hazewood v. Foundation Financial Group, LLC</u>, 551 F.3d 1223 (11th Cir. 2008), the plaintiff sued under RESPA § 8(b) alleging she was charged an unlawfully high premium on her title-insurance policy in violation of an Alabama price-control law. <u>Id.</u> at 1224. Although she acknowledged that at least a portion for the premium was for title insurance, she argued "that a *portion* of the title insurance fee was unearned or not for services actually performed." <u>Id.</u> at 1226 (emphasis in original). But as the Eleventh Circuit

observed, "Even if the excess portion of the premium was arguably 'unearned' as a matter of Alabama law, as a factual matter it was not in exchange for nothing." Id. Citing the plain meaning of the statute's prohibition on the acceptance of fees "other than for services actually performed," the court held that "for a settlement fee to be actionable, *no* services must be rendered in exchange for it." Id. at 1225. Because the plaintiff in fact received title insurance in exchange for the premium, the Eleventh Circuit affirmed the dismissal of her claim. Id.

Finally, in another fee-splitting case, Sosa v. Chase Manhattan Mortgage Corp., 348 F.3d 979 (11th Cir. 2003), the Eleventh Circuit found that the defendant did not retain an unearned fee when it charged borrowers a $50 courier fee but paid only a portion of that sum to third-party couriers it hired. The court noted the plaintiff failed to allege that the defendant did not perform any services; on the contrary, the court found that the defendant had performed a service for the borrowers by hiring third parties to make the deliveries. Id. at 983-84. Sosa thus demonstrates that hiring a contractor to perform work for which a borrower is charged is itself a service justifying a fee.

At bottom, <u>Friedman</u>, <u>Hazewood</u>, and <u>Sosa</u> illustrate that as long as a defendant performs actual services for a fee, there is no § 8(b) violation. To that end, courts have declined to parse fees into components to assess either their reasonableness or whether certain portions were unearned if "as a factual matter it was not in exchange for nothing." <u>See</u> <u>Hazewood</u>, 551 F.3d at 1226.

Here, it is undisputed that FMLS performed services for each transaction at issue. In each case, the Brokers and Agents used FMLS to list or find the properties that were ultimately sold. Thus, FMLS performed a service each time by connecting sellers and buyers through its directory. And when the Brokers remitted the Sold Fees to FLMS, those payments were "not in exchange for nothing." <u>See</u> <u>Hazewood</u>, 551 F.3d at 1226. The Court need not inquire further because RESPA does not require courts to assess the reasonableness of the fee or to divide the fee into earned or unearned components, as Plaintiffs urge.

As for Plaintiffs' theory that the Patronage Dividends establish a second § 8(b) violation by further splitting unearned fees, that claim also fails. Plaintiffs rest their "back-end" split claim on their argument that the Sold Fees are an unearned split. (<u>See</u> Pls.' Resp., Dkt. [295] at 71.) Because the Court

rejects this argument, Plaintiffs cannot establish a § 8(b) violation based on the

payment of Patronage Dividends, either.  In sum, Plaintiffs produce no evidence

that FMLS received a fee without performing services in return.  Defendants are

thus entitled to summary judgment on Plaintiffs' § 8(b) claim.

    D.     Section 8(c)(4)

Plaintiffs' final RESPA claim arises out of § 8(c)(4), which Plaintiffs

argue establishes liability for an undisclosed affiliated business arrangement

("ABA").  (See Pls.' Resp., Dkt. [295] at 72.)  Indeed, this Court held that §

8(c)(4) is independently actionable in its Order on Defendants' motion to

dismiss.  See Bolinger v. First Multiple Listing Serv., Inc., 838 F. Supp. 2d

1340, 1353-55 (N.D. Ga. 2012).  Defendants urge the Court to reconsider its

ruling in light of subsequent case law holding that § 8(c)(4) is a safe harbor

from RESPA liability, not an independent cause of action.  (See Defs.' Br., Dkt.

[272-2] at 65-71.)

According to § 8(c)(4), "Nothing in this section shall be construed as

prohibiting . . . (4) affiliated business arrangements so long as" the arrangement

is disclosed and certain other conditions are met.  12 U.S.C. § 2607(c).

The Court need not determine whether § 8(c)(4) furnishes an independent cause

22

of action, however, because even assuming it did, Plaintiffs fail to produce

evidence of an ABA.

RESPA defines an ABA as:

> an arrangement in which (A) a person who is in a position to refer
> business incident to or a part of a real estate settlement service
> involving a federally related mortgage loan, or an associate of such
> person, *has either an affiliate relationship with or a direct or
> beneficial ownership interest of more than 1 percent in a provider
> of settlement services*; and (B) either of such persons directly or
> indirectly refers such business to that provider or affirmatively
> influences the selection of that provider.

12 U.S.C. § 2602(7) (emphasis added).  "Affiliate relationship means the

relationship among business entities where one entity has effective

control over the other . . . ."  12 C.F.R. § 1024.15(c).

Defendant Brokers and Agents assert that they have no ownership

interest in, affiliate relationship with, or effective control over FMLS, and

Plaintiffs produce no evidence to dispute this.  In addition, Plaintiffs concede

that no named Defendant Brokers besides Atlanta Partners "has either a direct

or beneficial ownership interest of 1% or more in FMLS."  (Pls.' Resp., Dkt.

[295] at 75, 76 & n.38.)  Atlanta Partners, however, did not do business with

Plaintiffs, and Plaintiffs did not pay them a commission.  Having found that

Plaintiffs lack standing to pursue claims against Atlanta Partners, the Court

finds that no remaining Defendants were affiliated with FMLS or had a direct or

beneficial ownership interest of over 1% in FMLS.  Consequently, even if §

8(c)(4) were an independent cause of action, Defendants are not ABAs and are

therefore entitled to summary judgment on this claim.

**III.    State-Law Claims**

      A.    <u>Unjust Enrichment</u>

Plaintiffs state their unjust enrichment claim against FMLS alone,

arguing that "FMLS has been unjustly enriched at Plaintiffs' expense through

its receipt of Sold Fees undisclosed to Plaintiffs and funded by commissions

Plaintiffs paid the Defendant Brokers and Agents."  (Pls.' Resp., Dkt. [295] at

89.)  "Unjust enrichment is an equitable concept and applies when as a matter

of fact there is no legal contract, but when the party sought to be charged has

been conferred a benefit by the party contending an unjust enrichment which

the benefitted party equitably ought to return or compensate for."  <u>St. Paul</u>

<u>Mercury Ins. Co. v. Meeks</u>, 508 S.E.2d 646, 648 (Ga. 1998).  In other words,

"[t]he theory of unjust enrichment applies when there is no legal contract and

when there has been a benefit conferred which would result in an unjust

24

enrichment unless compensated." <u>Smith Serv. Oil Co. v. Parker</u>, 549 S.E.2d 485, 487 (Ga. Ct. App. 2001). Thus, to state a claim for unjust enrichment, a plaintiff must allege that the defendants "have received money belonging to the plaintiff or to which [the plaintiff] is in equity and good conscience entitled." <u>Haugabook v. Crisler</u>, 677 S.E.2d 355, 359 (Ga. Ct. App. 2009).

Defendants argue both that Plaintiffs did not confer a benefit on FMLS and that it is not inequitable for FMLS to retain the Sold Fees because it performed services for them. In response, Plaintiffs cite their previous arguments that "sellers paid and buyers funded the commissions used to pay Sold Fees." (Pls.' Resp., Dkt. [295] at 90.) But as discussed above, that is not the same as paying Sold Fees to FMLS. Rather, Plaintiffs paid commissions to their Brokers consistent with—or lower than—the commission rates agreed to in the brokerage contracts. The Brokers then paid Sold Fees out of their general operating accounts in relation to transactions for which FMLS provided listing services. Plaintiffs thus cannot show that FMLS received money belonging to them or that FMLS cannot in good conscience keep the Sold Fees. Defendant FMLS is accordingly entitled to summary judgment on Plaintiffs' unjust enrichment claim.

25

B.    Uniform and Deceptive Trade Practices Act

Plaintiffs allege that Defendant Brokers failed to disclose to Plaintiffs FMLS's rules with respect to its Principal Members and Associate Members, as well as the existence of Sold Fees and Patronage Dividends, "thereby failing to disclose to Plaintiffs the true amount and basis of calculating the Defendant Brokers' compensation and failing to disclose that they would benefit from a financial transaction effectuated on behalf of [Plaintiffs]."  (Pls.' Resp., Dkt. [295] at 85.)  Plaintiffs argue that this conduct violates the Uniform Deceptive Trade Practices Act ("UDTPA"), O.C.G.A. § 10-1-370 *et seq.*

Defendants note that the UDTPA does not apply to conduct that is already subject to regulation by a state or federal regulatory agency.  Plaintiffs treat this as a preemption argument but fail to address that the UDTPA "does not apply to . . . [c]onduct in compliance with the orders or rules of or a statute administered by a federal, state, or local government agency."  O.C.G.A. § 10-1-374(a)(1).  The Georgia Court of Appeals has addressed this provision with respect to insurance transactions.  The court noted that "the Insurance Code contains its own statutory scheme that regulates unfair trade practices within the insurance industry and gives the Insurance Commissioner the power to

26

investigate and act upon such claims against an insurer." <u>Ne. Ga. Cancer Care, LLC v. Blue Cross & Blue Shield of Ga., Inc.</u>, 676 S.E.2d 428, 434 (Ga. Ct. App. 2009).  Thus, the court reasoned, "claims of unfair trade practices in insurance transactions are governed by the Insurance Code, not Georgia's UDTPA." <u>Id.</u>

Plaintiffs cite in support of their UDTPA claim Defendants' alleged violations of rules promulgated by the Georgia Real Estate Commission ("GREC") pursuant to O.C.G.A. § 43-40-1 *et seq.*  They further argue that only the UDTPA provides them with the relief they seek, for "[n]o other claim in this case affords the right to an injunction to stop the practices at issue or to require disclosure thereof."  (Pls.' Resp., Dkt. [295] at 87.)  In deciding that insurance transactions were exempt from the UDTPA, however, the Georgia Court of Appeals did not analyze the availability of particular remedies under the relevant regulations; the important factor was the existence of "an extensive regulatory regime." <u>See</u> <u>Ne. Ga. Cancer Care</u>, 676 S.E.2d at 434.  In that regard, Defendants correctly point out that the relevant conduct here is regulated on the federal level by RESPA and the Consumer Financial Protection

27

Bureau,[5] and on the state level by GREC. As a result, the UDTPA does not apply, and Defendants are entitled to summary judgment on this claim.

### C.    Negligent Misrepresentation

Under Plaintiffs' theory of negligent misrepresentation, Defendant Brokers and Agents are liable for their failure to disclose information related to FMLS, the Sold Fees, and Patronage Dividends because "[b]y failing to disclose these critical elements of the transaction, the Defendant Brokers understated their compensation and did not timely and properly account for all money and property received in which Plaintiffs had an interest." (Pls.' Resp., Dkt. [295] at 92.)

The tort of negligent misrepresentation under Georgia law has three essential elements: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Hendon Props., LLC v. Cinema Dev., LLC, 620 S.E.2d 644,

---

[5] See 12 C.F.R. § 1024.1 (issuing Regulation X "by the Bureau of Consumer Financial Protection to implement the Real Estate Settlement Procedures Act").

649 (Ga. Ct. App. 2005). "Justifiable reliance is thus an essential element of a claim asserting negligent misrepresentation." Id.

Plaintiffs argue that Defendants had a duty to disclose adverse material facts under the Brokerage Relationships in Real Estate Transactions Act ("BRRETA"), O.C.G.A. § 10-6A-7(a)(2)(C). Plaintiffs further state that under O.C.G.A. § 43-40-25(b)(6), Defendants had an obligation to disclose any fee, rebate, or profit the Brokers would earn from the transaction.

Defendants assert that they did not supply false information to Plaintiffs because the brokerage agreements accurately reflected the commissions the Brokers received. (Defs.' Reply, Dkt. [324] at 42.) In addition, Defendants state that Plaintiffs cannot show they relied on any alleged false information or show that their reliance proximately caused them any economic injury. (Id.) The Court agrees. The brokerage agreements and HUD-1 Settlement Statements discussed above accurately represented the Brokers' commissions. There is no evidence the Brokers understated their compensation. Furthermore, Plaintiffs knew that under the agreements the Brokers would place listings with FMLS. As stated throughout this Order, Plaintiffs fail to explain how the Brokers' payment of Sold Fees caused them economic injury. Finally, the duty

29

to disclose any fee or rebate the Broker would earn, presumably referring to the Patronage Dividends, applies only to "receipt of a fee, rebate, or other thing of value on expenditures made on behalf of the principal for which the principal is reimbursing the licensee." O.C.G.A. § 43-40-25(b)(6). Plaintiffs did not reimburse the Brokers for their Sold Fees. Defendants are therefore entitled to summary judgment on Plaintiffs' negligent misrepresentation claim.

## IV.   Final Matters

The parties have also filed three motions to strike [257, 289, 290]. However, the Court did not rely on the evidence to which the parties object in those motions. Therefore, the parties' motions to strike [257, 289, 290] are **DENIED as moot**. Defendants additionally seek leave to file a reply to Plaintiffs' Response to Defendants' Statement of Material Facts. Defendants contend that Plaintiffs advanced improper arguments and assertions in their response instead of refuting Defendants' facts by citing to the record. The Court relied only on evidence cited in the record, and because the Court did not find any genuine disputes of material fact, Defendants' Motion for Leave to File a Reply [323] is also **DENIED as moot**.

AO 72A
(Rev.8/82)

Plaintiffs' Motion for Leave to File a Second Amended Complaint [266] remains pending. In its January 2, 2014 Order [270], the Court provided that Defendants could file their response to the motion within 30 days of the entry of this Order. In light of the Court's ruling herein, Plaintiffs' Motion for Leave to File a Second Amended Complaint [266] is **DENIED, with right to re-file**. Plaintiffs may file an amended motion to file second amended complaint within 30 days of the entry of this Order.

## Conclusion

For the foregoing reasons, Defendants' Motion to Strike Plaintiffs' Sur-Rebuttal Expert Reports [257], Plaintiffs' Motion to Strike the Testimony of Plaintiffs' Withdrawn Expert, Grant Mitchell [289], Plaintiffs' Motion to Strike Paragraphs Eleven (11) through Thirteen (13) of the Affidavit of Frederick G. Boynton [290], and Defendants' Motion for Order or for Leave to File a Reply to Plaintiffs' Response to Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment [323] are **DENIED as moot**. Next, Plaintiffs' Motion for Oral Argument [303] is **DENIED** and Defendants' Motion for Summary Judgment [272] is **GRANTED**. Plaintiffs' Motion for Leave to File a Second Amended Complaint [266] is **DENIED, with right to**

**re-file**. Plaintiffs may file an amended motion to file second amended complaint within 30 days of the entry of this Order.

       **SO ORDERED**, this  _26th_  day of September, 2014.

                    **RICHARD W. STORY**
                   United States District Judge

AO 72A
(Rev.8/82)